# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 11, 2012        Decided January 29, 2013

No. 12-1162

LOUIS A. DENAPLES,
PETITIONER

v.

OFFICE OF THE COMPTROLLER OF THE CURRENCY,
RESPONDENT

Consolidated with 12-1198

On Petitions for Review of the Final Decisions of the Office
of the Comptroller of the Currency and the Board of
Governors of the Federal Reserve System

*Howard N. Cayne* argued the cause for petitioner. With him on the briefs were *Lisa S. Blatt*, *Dirk C. Phillips*, and *R. Stanton Jones*.

*Douglas B. Jordan*, Attorney, Office of the Comptroller of the Currency, argued the cause for respondent. With him on the brief were *Horace G. Sneed*, Director of Litigation, *Allen H. Denson*, Attorney, *Richard M. Ashton*, Deputy General Counsel, Board of Governors of the Federal Reserve System, *Katherine H. Wheatley*, Associate General Counsel, and *John L. Kuray*, Attorney.

Before: ROGERS and BROWN, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: Section 19 of the Federal Deposit Insurance Act (FDIA) is enforced by several financial regulators offering varied (and occasionally inconsistent) interpretations of its scope. The provision restricts who may participate in the affairs of insured depository institutions and bank and savings and loan holding companies; specifically, it bars from participation individuals who have been convicted of certain criminal offenses or who have "agreed to enter into a pretrial diversion or similar program in connection with a prosecution for" the covered offenses, unless they obtain consent from the appropriate regulatory agency. 12 U.S.C. § 1829. Petitioner Louis DeNaples thought he successfully avoided the consequences of § 19 by convincing a Pennsylvania district attorney not to prosecute him for perjury, but he was wrong: he emerged from the state proceedings to find that the Office of the Comptroller of the Currency ("OCC") and the Board of Governors of the Federal Reserve System ("Board") had issued cease-and-desist orders enforcing § 19. DeNaples now challenges the agencies' authority to issue the cease-and-desist orders, as well as their respective conclusions that DeNaples' agreement with the prosecutor triggered § 19. We grant his petition in part and remand to the agencies.

I

At the time of the events that generated this case, DeNaples wielded significant influence over three financial institutions. He served as chairman and as a director of First

National Community Bank ("First National") in Pennsylvania and its parent bank holding company First National Community Bancorp ("Bancorp"). He also owned a large number of shares in Bancorp and an unrelated bank holding company in Connecticut, Urban Financial Group, Inc. ("Urban"). DeNaples does not dispute that these positions made him an "institution-affiliated party" of First National, Bancorp, and Urban, as defined by FDIA. *See* 12 U.S.C. § 1813(u).

For a while, DeNaples also owned the Mount Airy Casino in Pennsylvania. In 2008, however, the local district attorney charged him with perjury, alleging he had lied to the Pennsylvania Gaming Control Board about his relationships with suspected members of the mob when applying for the casino's gaming license. The Gaming Board promptly suspended DeNaples' gaming license and prohibited him from controlling and managing the casino. OCC followed suit, suspending DeNaples from serving as an officer of First National and prohibiting him from further participation in the affairs of any depository institution until the charges were resolved. *See* 12 U.S.C. § 1818(g).

In April 2009, DeNaples entered an Agreement for Withdrawal of Charges ("Agreement") under which the district attorney would withdraw all pending criminal charges if DeNaples would divest his financial and operational interests in the casino, permit the public release of a report about procedural irregularities in the underlying grand jury proceeding, pay the costs of prosecution, waive all legal claims against the state and its agents arising from the perjury investigation and prosecution, and file written quarterly reports with the district attorney describing the status of both his compliance with the Agreement and any proceedings before the Gaming Board. The Agreement further provided

that the district attorney could reinstate the charges if DeNaples breached its terms in any material way. The district attorney subsequently withdrew the charges and entered a disposition of *nolle prosequi*.

Unfortunately for DeNaples, things did not end there. Though the district attorney's office advised OCC that the Agreement did not constitute a pretrial diversion or similar program under state law, OCC nevertheless notified DeNaples that it considered the Agreement to be such a program and that it triggered § 19. The Board did the same.

DeNaples did not agree with the agencies' interpretations of § 19, so he neither resigned his positions with First National and Bancorp nor divested his shares of Bancorp and Urban. The agencies accordingly issued Notices of Charges and ordered hearings to determine whether they should issue cease-and-desist orders under 12 U.S.C. § 1818(b). The ALJ assigned to the case issued a consolidated decision rejecting DeNaples' arguments that the agencies were not statutorily authorized to issue the cease-and-desist orders and that the Agreement did not constitute a § 19 "pretrial diversion or similar program." Seeking to avoid the consequences of the ALJ's recommendations, DeNaples entered into a "superseding addendum" to the Agreement with the Pennsylvania district attorney acknowledging the parties negotiated and executed the Agreement with the understanding that "the criminal charges against Mr. DeNaples would under no circumstances be disposed of in a manner that would constitute, or that could be construed as constituting, Mr. DeNaples' entry into a pretrial diversion or similar program"; he also successfully sought expunction of all records of the charges, including the Agreement. But to no avail. Both OCC and the Board generally adopted the ALJ's recommendations and, in the spring of 2012, issued the

dreaded cease-and-desist orders, requiring DeNaples to stop violating § 19 and to terminate his relationships with First National, Bancorp, and Urban. DeNaples then filed these petitions for review.

II

DeNaples argues that the agencies' cease-and-desist orders exceeded their statutory authority under FDIA § 8(b), which empowers OCC and the Board to initiate cease-and-desist proceedings against an institution-affiliated party who is violating or has violated a law. *See* 12 U.S.C. § 1818(b). The provision is hardly a model of clarity, but the parties' dispute allows us to avoid wandering FDIA's linguistic labyrinth: DeNaples challenges only the agencies' use of their cease-and-desist powers to remove him from office when FDIA provides specific removal mechanisms in § 8(e) and (g). Subsection (e) empowers the agencies to remove institution-affiliated parties from office or prohibit them from participating in the affairs of depository institutions if and only if the appropriate agency can establish misconduct, culpability, and a statutorily-defined effect.[1] *Proffitt v. FDIC*,

---

[1] In relevant part, subsection (e) ("Removal and prohibition authority") reads:

    (1) AUTHORITY TO ISSUE ORDER.—Whenever the appropriate Federal banking agency determines that—

        (A) any institution-affiliated party has, directly or indirectly—

            (i)     violated—

              (I)     any law or regulation;

           . . . .

        (B) by reason of the violation, practice, or breach described in . . . subparagraph (A)—

200 F.3d 855, 862 (D.C. Cir. 2000). Subsection (g), meanwhile, authorizes removal and prohibition when there is a conviction or a "pretrial diversion or other similar program" in connection with certain crimes, but agencies may invoke this authority only if the individual's continued participation in the institution's affairs threatens public confidence in the institution or the interests of the depositors. 12 U.S.C. § 1818(g)(1).[2] DeNaples insists the agencies may remove

---

(i)      such insured depository institution or business institution has suffered or will probably suffer financial loss or other damage;

(ii)     the interests of the insured depository institution's depositors have been or could be prejudiced; or

(iii)    such party has received financial gain or other benefit by reason of such violation, practice, or breach; and

(C) such violation, practice, or breach—

(i)      involves personal dishonesty on the part of such party; or

(ii)     demonstrates willful or continuing disregard by such party for the safety or soundness of such insured depository institution or business institution,

the appropriate Federal banking agency for the depository institution may serve upon such party a written notice of the agency's intention to remove such party from office or to prohibit any further participation by such party, in any manner, in the conduct of the affairs of any insured depository institution.

12 U.S.C. § 1818(e).

[2] In relevant part, subsection (g) ("Suspension, removal, and prohibition from participation orders in the case of certain criminal offenses") reads:

(1) SUSPENSION OR PROHIBITION.—

. . . .

    (C) REMOVAL OR PROHIBITION.—

institution-affiliated parties from office only through one of these two mechanisms. We review *de novo* the agencies' interpretation of their cease-and-desist authority, *see Grant Thornton, LLP v. Office of the Comptroller of the Currency*, 514 F.3d 1328, 1331 (D.C. Cir. 2008), and affirm.

DeNaples swims against the current because he asks us to restrict what the statute apparently authorizes. DeNaples concedes he is an "institution-affiliated party" and never disputes that § 19 is a "law," so assuming the agencies properly determined that DeNaples triggered the § 19 prohibition, DeNaples continues to violate it while he maintains his relationships with First National, Bancorp, and Urban without the requisite agency consent. We take no position on whether § 8(b) generally authorizes removal and prohibition orders, *see Kaplan v. U.S. Office of Thrift*

> (i) IN GENERAL.—If a judgment of conviction or an agreement to enter a pretrial diversion or other similar program is entered against an institution-affiliated party in connection with a crime [either involving dishonesty or breach of trust, punishable by more than one year of imprisonment under either state or federal law, or that violates specified federal statutes], at such time as such judgment is not subject to further appellate review, the appropriate Federal banking agency may, if continued service or participation by such party posed, poses, or may pose a threat to the interests of the depositors of, or threatened, threatens, or may threaten to impair public confidence in, any relevant depository institution . . ., issue and serve upon such party an order removing such party from office or prohibiting such party from further participation in any manner in the conduct of the affairs of any depository institution without the prior written consent of the appropriate agency.

12 U.S.C. § 1818(g).

*Supervision*, 104 F.3d 417, 420 & n.1 (D.C. Cir. 1997), and indeed, the agencies tell us it does not. But this is a case where an individual's relationship with the financial institution in question is itself the legal violation, a unique enforcement scenario, and on such facts, an agency cease-and-desist order is not rendered improper because it entails the individual's removal and prohibition.

We are mindful of the obligation both to recognize the agencies' "broad authority," *Golden Pac. Bancorp v. Clarke*, 837 F.2d 509, 512 (D.C. Cir. 1988), and to preserve the statute's "remedial safeguards," *Oberstar v. FDIC*, 987 F.2d 494, 502 (8th Cir. 1993). Section 8, after all, balances the need to protect financial institutions and the economy against concerns of fairness and the need to protect against the possibility of abuse. But we are also mindful of the "fundamental principle that where Congress has entrusted an administrative agency with the responsibility of selecting the means of achieving the statutory policy the relation of remedy to policy is peculiarly a matter for administrative competence." *Kornman v. SEC*, 592 F.3d 173, 186 (D.C. Cir. 2010) (ellipsis and internal quotation marks omitted). And so it is here. Whatever the arguments against an agency's general use of cease-and-desist authority to remove officers, *see, e.g.*, S. REP. NO. 94-843, at 6 (May 13, 1976) (explaining that cease-and-desist action "can be taken to require the cessation of such practices *short of removal of the individual from participation in the affairs of the institution*" (emphasis added)); *Seidman v. Office of Thrift Supervision*, 37 F.3d 911, 929, 939 (3d Cir. 1994) (similar), they have less force when the agency uses the power to enforce § 19. Subsection (e)'s misconduct, culpability, and effect requirements may have no analogue in § 19, but § 19 serves the same function as a proxy for Congress's judgment that certain predicate facts are immediately disqualifying; and there is no call to fear

unbridled agency action when the agency action does no more than enact congressional will. Likewise, though a single set of predicate facts might trigger both subsection (g) and § 19—suggesting that a cease-and-desist order could be an end-run around the limits Congress imposed on the agencies' prohibition authority—the benefits and detriments are pretty evenly matched: subsection (g) requires only a postdeprivation hearing, 12 U.S.C. § 1818(g)(3), while subsection (b) requires predeprivation procedures, *id.* § 1818(b)(1),[3] thus enabling the agencies to pick the enforcement mechanism "best-suited to a given situation in light of the balance between supervisory exigency and due process concerns." Resp't's Br. at 46; *see FDIC v. Mallen*, 486 U.S. 230, 236 n.7, 246 n.12 (1988) (explaining that § 19 suspension or removal "does not moot a § 1818(g) suspension" because "[i]n certain respects, the § 1818(g) suspension is broader in scope than the § 1829 suspension, thus giving . . . the § 1818(g) suspension at least a marginal effect").

That there is overlap among the various enforcement provisions is not surprising. Congress sought to give the agencies "more effective regulatory powers to deal with crises in financial institutions." *Mallen*, 486 U.S. at 232. In doing so, Congress could reasonably hand the agencies a palette sufficiently sophisticated to capture the full spectrum of

---

[3] For this reason, we reject DeNaples' suggestion that the agencies' invocation of subsection (b) implicates due process concerns because it does not impose the same sort of constraints on the agencies' use of the power as do subsections (e) and (g). DeNaples' assertion that under *Feinberg v. FDIC*, 420 F. Supp. 109 (D.D.C. 1976), the original version of subsection (g) was constitutionally defective because it contained no standards to guide agencies' discretion is imprecise. *See FDIC v. Mallen*, 486 U.S. 230, 234 n.4 (1988).

enforcement possibility. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2072 (2012) (explaining that the interpretive canon that the specific governs the general is "not an absolute rule," only a "strong indication of statutory meaning that can be overcome by textual indications that point in the other direction").

## III

The agencies' statutory authority to enforce § 19 notwithstanding, their cease-and-desist orders are proper only if DeNaples in fact violated the statute. Predictably, DeNaples claims he did not. Before reaching the merits, however, we must address the Board's claim that its interpretations of FDIA § 19 are entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). They are not. Justifications for deference begin to fall when an agency interprets a statute administered by multiple agencies. *See Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 642 n.30 (1986). This Court has accordingly distinguished among "generic statutes like the APA, FOIA, and FACA," statutes like FDIA under which agencies have specialized—but potentially overlapping—authority, and statutes "where expert enforcement agencies have mutually exclusive authority over separate sets of regulated persons." *Collins v. Nat'l Transp. Safety Bd.*, 351 F.3d 1246, 1253 (D.C. Cir. 2003). It is only the last category that unequivocally demands deference.

We have repeatedly pointed to the agencies' joint administrative authority under FDIA to justify refusing deference to their interpretations.[4] *See, e.g.*, *Grant Thornton,*

---

[4] We have not been entirely consistent and unambiguous on this point. In *Stoddard v. Board of Governors of the Federal Reserve System*, 868 F.2d 1308, 1310 (D.C. Cir. 1989), for

*LLP*, 514 F.3d at 1331; *Proffit*, 200 F.3d at 860, 863 n.7; *Rapaport v. U.S. Dep't of Treasury, Office of Thrift Supervision*, 59 F.3d 212, 216–17 (D.C. Cir. 1995); *Wachtel v. Office of Thrift Supervision*, 982 F.2d 581, 585 (D.C. Cir. 1993). We have never addressed § 19, but we will not change course now.

Section 19 vests the Board with exclusive authority to allow persons who would otherwise be excluded to participate in the affairs of bank and savings and loan holding companies. *See* 12 U.S.C. § 1829(d)–(e). But that does not mean the Board has exclusive *enforcement* authority over § 19 violations. *See, e.g.*, *United States v. Carter*, 652 F.3d 894, 897 (8th Cir. 2011) (affirming district court's sentencing declaration under 12 U.S.C. § 1829 that convicted defendant "shall not obtain employment in an institution insured by the FDIC"). As this case illustrates, a single individual may be subject to enforcement action by multiple agencies, and were we to defer to the Board's interpretation here, we "would lay the groundwork for a regulatory regime in which either the same statute is interpreted differently by the several agencies or the one agency that happens to reach the courthouse first is allowed to fix the meaning of the text for all." *Rapaport*, 59 F.3d at 216–17. We have no reason to think Congress intended such "peculiar corollaries." *Id.* at 217.

Accepting the possibility of multiple coexisting interpretations as the Board urges us to do is particularly problematic because, as the Board informs us, § 19 violations

example, we summarily invoked *Chevron* in rejecting the Board's interpretation of FDIA § 8(e). Other circuits have taken a similar approach. *See, e.g.*, *Akin v. Office of Thrift Supervision Dep't of Treasury*, 950 F.2d 1180, 1185 (5th Cir. 1992); *Van Dyke v. Bd. of Governors of Fed. Reserve Sys.*, 876 F.2d 1377, 1379 (8th Cir. 1989).

may trigger criminal penalties. There is therefore a compelling need for interpretive uniformity. *See Collins*, 351 F.3d at 1253; *cf. United States v. Santos*, 553 U.S. 507, 514 (2008) (plurality opinion) (noting "the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed"). No one should face "multiple and perhaps conflicting interpretations of the same requirement," *Collins*, 351 F.3d at 1253, when disobedience may result in imprisonment and million-dollar-a-day penalties. *See* 12 U.S.C. § 1829(b).

IV

DeNaples argues he did not violate § 19 because he never entered into a "pretrial diversion or similar program" and because the record of his prosecution has been expunged. We agree the agencies need to reevaluate both issues.

A

In determining that the Agreement constituted a "pretrial diversion or similar program," both agencies claimed they considered the "ordinary meaning" of the phrase and concluded it extends to any diversion from prosecution in exchange for an agreement to abide by particular conditions. As OCC put it, the provision is triggered any time an individual is "diverted from prosecution by agreeing to certain conditions"—that is, by any "*quid pro quo* for the prosecutor's withdrawal of charges." The Board, in turn, offered a tighter definition, concluding the provision turns on whether the agreement provides for both a "suspension or eventual dismissal of charges or criminal prosecution" and a "voluntary agreement by the accused to treatment, rehabilitation, restitution or other noncriminal or nonpunitive

alternatives," but it ultimately applied an approach much closer to OCC's, determining that the Agreement fell within the statutory ambit because "the District Attorney withdrew criminal perjury charges against Respondent conditioned on Respondent agreeing to certain noncriminal alternatives." Neither approach works. The agencies properly sought the ordinary meaning of the statutory phrase, *see Taniguchi v. Kan Pac. Saipan, Ltd.*, 132 S. Ct. 1997, 2002 (2012), but despite their efforts, they did not find it.

"[T]here is no one model of pretrial diversion," John Clark, PRETRIAL JUSTICE INST., PRETRIAL DIVERSION AND THE LAW I-1 (2006), but a few conceptual threads loosely bind the myriad definitions. Generally, the term "pretrial diversion" refers to (1) a discrete program that (2) seeks some offender- or community-oriented outcome. The term is thus defined by functional, not formal, criteria; it is nothing more than a recognition that not all offenders need be clapped in irons. *See, e.g.*, *United States v. Moore*, 486 F.2d 1139, 1193 (D.C. Cir. 1973); NATIONAL ASSOCIATION OF PRETRIAL SERVICES AGENCIES, PERFORMANCE STANDARDS AND GOALS FOR PRETRIAL DIVERSION/INTERVENTION 1–2 (2008) ("NAPSA, PRETRIAL DIVERSION"). A standard pretrial diversion might therefore require education, job services and vocational training, counseling and psychiatric care, community service, or restitution payments. *See, e.g.*, BLACK'S LAW DICTIONARY 546, 1307 (9th ed. 2009); DEP'T OF JUSTICE, UNITED STATES ATTORNEYS' MANUAL: CRIMINAL RESOURCE MANUAL § 712(E) (1997); NATIONAL ASSOCIATION OF PRETRIAL SERVICES AGENCIES, PRETRIAL DIVERSION IN THE 21ST CENTURY: A NATIONAL SURVEY OF PRETRIAL DIVERSION PROGRAMS AND PRACTICES 5 (2009). But at the very least, pretrial diversion is more than just a quid pro quo resulting in the dismissal of charges. A plea bargain, for instance, would not be a pretrial diversion, no matter its similarity to pretrial

diversion for other purposes, *see, e.g.*, *United States v. Harris*, 376 F.3d 1282, 1287 (11th Cir. 2004), nor would an agreement to testify against a codefendant. Indeed, the prosecutor might have overcharged the defendant in the first place hoping to leverage a deal. *See* H. Mitchell Caldwell, *Coercive Plea Bargaining: The Unrecognized Scourge of the Justice System*, 61 CATH. U. L. REV. 63, 65 & n.13 (2011). If a quid pro quo alone triggered § 19, an individual like DeNaples who wished to maintain his relationship with a bank or bank holding company would have to throw the dice and hope either the prosecutor unilaterally dismisses the charges or that he prevails at trial.

The statutory expansion of the pretrial diversion concept through the "or similar program" language does not, as the agencies suggested at oral argument, disconnect "pretrial diversion" from the term "program"; it expands the category to encompass programs that do not necessarily constitute pretrial diversion. If, for instance, pretrial diversion is available only in cases with "prosecutorial merit," *see* NAPSA, PRETRIAL DIVERSION, at 3, or where defendants "acknowledge responsibility for their actions," *Taylor v. Gregg*, 36 F.3d 453, 455 (5th Cir. 1994), the phrase "or similar program" ensures the provision might nonetheless be triggered where the prosecutor decides the case cannot be successfully prosecuted or where the arrangement does not require the defendant to acknowledge responsibility. Or it might be triggered by a defendant who does not meet the formal eligibility criteria of the available pretrial diversion program, *see, e.g.*, Note, *Pretrial Diversion from the Criminal Process*, 83 YALE L.J. 827, 832–34 (1974), or where the program involves specialty courts like drug courts, which arguably do not amount to pretrial diversion because they require the participation of judicial officers. *See, e.g.*, *United States v. Hicks*, 693 F.2d 32, 34 (5th Cir. 1982) ("[N]o

'adjudicative element' is present in the pretrial diversion context . . . ."); Joseph M. Zlatic et al., *Pretrial Diversion: The Overlooked Pretrial Services Evidence-Based Practice*, FED. PROBATION, Vol. 74, June 2010, at 29 ("Zlatic et al., *Pretrial Diversion*") (differentiating pretrial diversion from "seemingly similar programs, such as specialty courts" that involve a "judicial officer"). But whatever the contours of the programs that trigger §19, the ultimate effect of the "or similar program" language is not to turn the statute from a scalpel into a chainsaw; it simply ensures that competition among the various definitions of "pretrial diversion" does not short-circuit the statute.

To be clear, we do not establish a set of necessary or sufficient criteria for the term "pretrial diversion" or for the types of programs that are "similar" to pretrial diversion programs: the concepts are not amenable to that sort of precision. But the statutory text dictates a set of parameters the agencies may not exceed. The Board's definition—invoking "treatment, rehabilitation, restitution"—acknowledges these parameters, and the agencies' counsel confirmed them at oral argument when he applied the *ejusdem generis* canon of interpretation[5] to that definition and conceded that a defendant's agreement not to sue the state for malicious prosecution, to be reaffirmed every year for five years, would not fall within the Board's catch-all category of "other noncriminal or nonpunitive alternatives." We agree with this approach. Adherence to the parameters dictated by the text, generally referenced by the Board's definition, and confirmed by the agencies' counsel at oral argument is

---

[5] "A canon of construction holding that when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same class as those listed." BLACK'S LAW DICTIONARY 594 (9th ed. 2009).

particularly important because § 19 violations may trigger steep criminal penalties: the nature of that trigger must be clear. The agencies' approaches must accordingly be consistent with the nature of pretrial diversion; clarity demands no less. We therefore remand for both agencies to reconsider whether DeNaples' Agreement constitutes a "pretrial diversion or similar program."

We offer the following additional observation to guide the agencies on remand: the agencies' claim that state law is irrelevant to defining "pretrial diversion or similar program" misses the relationship between federal and state law in this context. Section 19 ties the "pretrial diversion or similar program" to "a prosecution for such offense," namely "any criminal offense involving dishonesty or a breach of trust or money laundering." As the expansive "any" suggests—and as the agencies' enforcement actions in this case confirm—the category of offenses that trigger § 19 includes more than federal law. *See, e.g.*, *Farlow v. Wachovia Bank of N.C., N.A.*, 259 F.3d 309, 311 (4th Cir. 2001); *see also Scott v. Illinois*, 440 U.S. 367, 380 n.10 (1979) (Brennan, J., dissenting). Whether someone triggers § 19 by agreeing to enter a pretrial diversion therefore cannot be neatly severed from the predicate offense, and we expect agencies will heed the nuances of federalism. To the extent Congress was concerned with punishment and expected § 19 to do more than just provide the agencies a vehicle to make technical determinations of fitness unique to the financial industry, its expectations are vindicated by the incorporation of state law into an agency's § 19 calculus. *See, e.g.*, H.R. REP. NO. 101-681(I), at 69, 171, 173 (Sept. 5, 1990), *reprinted in* 1990 U.S.C.C.A.N. 6472, 6473, 6577, 6579; *cf. Nat'l State Bank, Elizabeth, N.J. v. Long*, 630 F.2d 981, 988 (3d Cir. 1980) (explaining about § 8(b) that Congress "was concerned not only with federal but with state law as well, particularly as it

might bear on corruption of bank officials or the financial stability of the institution," so a state prohibition might "directly implicate[] concerns in the banking field"). Of course, as our discussion of the "or similar program" language makes clear, a finding that the Agreement does not fall under any state conception of pretrial diversion would not preclude application of § 19. Indeed, if, as OCC suggested in a letter to DeNaples and the ALJ subsequently affirmed, the terms of the Agreement amounted to a restitution plan, the extension of § 19 to the Agreement may very well be proper. But if not, we expect the agencies' ultimate decisions to nevertheless account for the importance of a mechanism for putting individuals like DeNaples—who negotiated the Agreement precisely because it would have no § 19 implications—on notice about what triggers § 19.

The Board recognized the potential relevance of state law in its decision below, but it also appears to have minimized the relevance by claiming that state law definitions of "pretrial diversion" are "not meant to address" the statutory interest in assessing "the benefits and risks of [individuals'] continued involvement in banking." There is a difference, however, between the Board's administrative authority to grant waivers and the events that trigger § 19 in the first place. Perhaps state law does not track the interests of federal regulators, but when congressional judgment about what should trigger § 19 in the first place turns on state law precisely because of the interests that the state law presumably seeks to vindicate, the ostensible gap between the interests of state actors and federal regulators is a non sequitur.

18

B

DeNaples rests his entire expunction argument on an FDIC policy statement excluding "completely expunged" convictions from the scope of § 19. FDIC Statement of Policy on FDIA Section 19, 63 Fed. Reg. 66,177, 66,180, 66,184 (Dec. 1, 1998) ("FDIC Policy Statement"). An expunction is complete, FDIC explained, when "the records of conviction are not accessible by any party, including law enforcement, even by court order." Clarification of Statement of Policy for Section 19 of the Federal Deposit Insurance Act, 76 Fed. Reg. 28,031, 28,032 (May 13, 2011). According to DeNaples, because no one—including law enforcement, state licensing authorities, or other governmental officials—is permitted access to the record of his prosecution, even by court order, § 19 does not apply.

In the cease-and-desist proceedings, the agencies rejected the FDIC policy as irrelevant. OCC punted on the issue, explaining that the expunction is relevant only to an FDIC waiver decision and declaring that the Agreement had legal force under Pennsylvania law for a period before it was expunged, so DeNaples in fact violated the statute at some point. The Board, meanwhile, stated that it is not bound by the FDIC policy, and even if the policy applied, its treatment of expunged convictions does not govern an expunged prosecution; this makes sense, the Board reasoned, because § 19 addresses the historical fact of an agreement to enter a pretrial diversion or similar program, which expunction does not affect.

According to DeNaples, however, OCC and the Board in fact adopted the FDIC policy, rendering their refusals to follow that policy arbitrary and capricious. In particular, he points to (1) a rule implementing the Secure and Fair

19

Enforcement for Mortgage Licensing Act the agencies jointly adopted, in which they expressly invoked FDIC's § 19 exemption of expunged convictions as the touchstone for determining the scope of certain regulated parties' disclosure obligations, *see* Registration of Mortgage Loan Originators, 75 Fed. Reg. 44,656, 44,670 (July 28, 2010); and (2) an interim final rule the Board issued "to implement section 19 of the FDI Act with respect to [savings and loan holding companies]" after the Dodd-Frank Wall Street Reform and Consumer Protection Act gave the Board supervisory authority over them. Savings and Loan Holding Companies Rule, 76 Fed. Reg. 56,508, 56,518 (Sept. 13, 2011). In the interim final rule, the Board explained that § 19 is not triggered with respect to savings and loan holding companies by "arrests, pending cases not brought to trial, . . . or expunged convictions." *Id.* at 56,551.[6] Though DeNaples does not point it out, we note also that OCC's initial § 19 enforcement letter to DeNaples twice invoked the FDIC policy statement to justify its legal conclusion. OCC further noted in its decision below an FDIC staff lawyer's explanation that the FDIC policy statement does not distinguish between expunction of convictions and expunction of a pretrial diversion agreement. (It is not clear whether this contradicts FDIC's assertion in the preamble to its policy statement that exempting expunged convictions "appears to create an anomalous result when compared with" the pretrial

---

[6] The agencies suggest DeNaples waived these arguments by not raising them below, *see Coburn v. McHugh*, 679 F.3d 924, 929 (D.C. Cir. 2012), but the record belies the agencies' claim: DeNaples raised the issue, and the agencies' orders clearly reflect their respective positions on the matter. The agencies essentially ask us to find waiver because DeNaples failed to point the agencies to their own regulations. This we will not do. *See Nuclear Energy Inst. v. EPA*, 373 F.3d 1251, 1290–92 (D.C. Cir. 2004); *White v. U.S. Dep't of the Army*, 720 F.2d 209, 211 (D.C. Cir. 1983).

diversion language in § 19. *See* FDIC Policy Statement, 63 Fed. Reg. at 66,180.)

Synthesizing the various agencies' positions, we are apparently left with a scheme that, in practice, operates as follows. *First*, FDIC takes the position that individuals whose pretrial diversion agreements have been completely expunged need not apply for a § 19 waiver because the statute exempts them. *Second*, OCC relied on FDIC's policy statement when it initiated its enforcement against DeNaples, but it nevertheless believes that, notwithstanding a subsequent expunction, the pre-expunction period is sufficient to trigger § 19 and, therefore, its waiver scheme—even though the agency administering that waiver scheme does not recognize the need for a waiver application. *Third*, the Board disclaims the relevance of the FDIC policy statement with respect to bank holding companies, but it adopted an equivalent approach with respect to savings and loan holding companies even though § 19 provides no clear textual basis for treating the two types of institutions differently. Perhaps, as the Board now explains, the interim final rule simply preserved the status quo set by the Office of Thrift Supervision when it regulated savings and loan holding companies, but that does not change the consequence of the interim final rule. *Fourth*, both OCC and the Board adopted FDIC's position on expunged convictions in the course of administering a different statute. Different statutes, of course, reflect different policy goals and seek to achieve different real-world results, so an agency might reasonably take different approaches to similar issues in different statutes, but the effect in this context is bizarre.

This is untenable. Discerning the effect of an expunged conviction under § 19, let alone an expunged pretrial diversion arrangement, is like trying to draw a two-

dimensional shape on the surface of a grapefruit. As we have explained, the operation of a statute that may result in the type of severe criminal penalties imposed by § 19 must be clearer. On remand, we expect the agencies to sort out their respective positions.

DeNaples' argument that the agencies acted arbitrarily turns on the FDIC policy statement both exempting expunction of pretrial diversion agreements *and* binding OCC and the Board on that point. The agencies argue that is not clearly the case, and we agree. *See* FDIC Policy Statement, 63 Fed. Reg. at 66,180. However, other explanations by the regulators have less traction. While distinctions between convictions and pretrial diversions may be justifiable, the agencies must acknowledge these differences explicitly—and consistently—and explain why they make sense or why the policy statement should govern in some instances but not others. *See County of L.A. v. Shalala*, 192 F.3d 1005, 1022 (D.C. Cir. 1999) ("A long line of precedent has established that an agency action is arbitrary when the agency offer[s] insufficient reasons for treating similar situations differently."). Until now, the agencies have dedicated little effort to that explanatory enterprise, focusing rather on the applicability of the policy statement to the Agreement. On remand, then, we instruct the agencies to offer a rational explanation for the applicability (or not) of the policy statement and a rational distinction (if they have one) between expunction of convictions and expunction of pretrial diversion programs. Such is the essence of reasoned decision making.

V

Because the agencies applied an improper definition of "pretrial diversion or similar program" and failed to adequately justify their positions on DeNaples' expunction,

we grant DeNaples' petitions for review in part, vacate the agencies' orders, and remand for the agencies to determine whether the Agreement falls within the parameters we now identify. In its current form, the agencies' scattergun approach is too unpredictable. We deny DeNaples' petitions in all other respects.

*So ordered.*