# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued December 7, 2017        Decided July 20, 2018

No. 16-5065

JAMES J. KAUFMAN,
APPELLANT

v.

KIRSTJEN M. NIELSEN, SECRETARY, UNITED STATES
DEPARTMENT OF HOMELAND SECURITY, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:14-cv-00695)

*Amit R. Vora*, Supervising Attorney, Georgetown University Law Center, appointed by the court, argued the cause as *amicus curiae* in support of appellant. With him on the briefs were *Steven H. Goldblatt*, Director, appointed by the court, and *Stephan S. Dalal*, *Cole H. Mayhew*, and *Damon R. Porter*, Student Counsel.

*James J. Kaufman*, pro se, filed the briefs for appellant.

*Yamileth G. Davila*, Senior Litigation Counsel, U.S. Department of Justice, argued the cause for appellees. With her on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General at the time the brief was filed, and

*Sarah S. Wilson*, Senior Litigation Counsel. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

Before: TATEL, GRIFFITH, and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: James Kaufman has tried to renounce his U.S. citizenship for more than a decade. In 2014, a field office of U.S. Citizenship and Immigration Services (USCIS) denied Kaufman's renunciation request, claiming that he lacked the "intention" necessary to relinquish his citizenship under the Immigration and Nationality Act (INA). Kaufman challenged USCIS's decision in district court under the Administrative Procedure Act (APA). The court granted summary judgment for USCIS. Because USCIS wrongly interpreted the INA's intention requirement, we reverse.

I

A

Kaufman is a native-born U.S. citizen, and he holds no dual citizenship with any other country. In 1997, he was convicted in Wisconsin state court of first-degree sexual assault of a minor. Beginning in 2004, while serving his prison sentence, Kaufman began his still-ongoing effort to renounce his U.S. citizenship under the INA.

Under 8 U.S.C. § 1481(a), a U.S. citizen may give up his nationality by voluntarily performing any one of seven expatriating acts "with the *intention* of relinquishing United

States nationality." (emphasis added).[1] One expatriating act, for example, is to make a "formal renunciation" of citizenship while abroad. *Id.* § 1481(a)(5) (the "foreign-renunciation provision"). Kaufman has sought to relinquish his citizenship through a provision that permits renunciation while on U.S. soil. *Id.* § 1481(a)(6). This "domestic-renunciation provision" permits Kaufman to forfeit his citizenship while in the United States if he voluntarily and intentionally makes a "formal written renunciation of nationality." *Id.* The provision contains several additional requirements, but they are not at issue in this case. The only issue here is whether Kaufman satisfied the "intention" requirement that applies to all seven expatriating acts.

---

[1] Section 1481(a) provides in abbreviated form:

(a) A person who is a national of the United States whether by birth or naturalization, shall lose his nationality by voluntarily performing any of the following acts with the intention of relinquishing United States nationality—

(1) - (4) [under certain circumstances: naturalizing in a foreign state; pledging allegiance to a foreign state; entering the armed forces of a foreign state; or accepting employment by a foreign state]; or

(5) making a formal renunciation of nationality before a diplomatic or consular officer of the United States in a foreign state, in such form as may be prescribed by the Secretary of State; or

(6) making in the United States a formal written renunciation of nationality in such form as may be prescribed by, and before such officer as may be designated by, the Attorney General, whenever the United States shall be in a state of war and the Attorney General shall approve such renunciation as not contrary to the interests of national defense; or

(7) [committing acts such as treason].

Kaufman began his efforts by sending renunciation requests to several federal agencies, including the Department of Justice, the Department of State ("State Department"), and USCIS, which is within the Department of Homeland Security (DHS). Most of the agencies either redirected Kaufman to other agencies or did not respond to his request at all. While it was clear that the State Department administers foreign renunciations, there was some confusion over which agency and office was responsible for administering domestic renunciations after the creation of DHS in 2002. However, USCIS ultimately responded to Kaufman's request and denied it on the merits.

Kaufman then filed a pro se lawsuit against the Attorney General and the Secretaries of the State Department and DHS, arguing that they had violated his statutory and constitutional rights by refusing to allow him to renounce his citizenship. *See Kaufman v. Gonzalez*, No. 05-1631, 2006 WL 1725579 (D.D.C. June 20, 2006). Kaufman sought a declaration that the Attorney General had jurisdiction over domestic renunciations and failed to fulfill his duty to administer such renunciations. The district court granted the government's motion to dismiss, but we reversed. *See Kaufman v. Mukasey*, 524 F.3d 1334 (D.C. Cir. 2008). Although we did not decide which agency had jurisdiction over domestic renunciations, we instructed the district court to address that question on remand. *Id.* at 1336.

On remand, the parties agreed that USCIS is responsible for administering the domestic-renunciation provision. *See Kaufman v. Holder*, 686 F. Supp. 2d 40, 41-42 (D.D.C. 2010). Kaufman then renewed his request, which USCIS denied because the United States was not in a "state of war," as required by the statute. *Id.* at 42 (quoting 8 U.S.C.

§ 1481(a)(6)). Kaufman challenged USCIS's denial as arbitrary and capricious under the APA, and the district court found that USCIS erred as a matter of law when it concluded that only congressional declarations of war satisfied the "state of war" requirement. The court concluded that the plain meaning of the domestic-renunciation provision was more expansive and included certain congressional authorizations for the use of military force. *Id.* at 44-45. The government initially appealed the district court's decision but then voluntarily moved to dismiss the appeal. *See Kaufman v. Holder*, No. 10-5124, 2010 WL 3245512 (D.C. Cir. Aug. 17, 2010) (granting the government's motion to dismiss). In the instant case, USCIS assumes that the "state of war" requirement is satisfied.

On remand from the district court, USCIS held Kaufman's renunciation request in abeyance until he completed his prison sentence. While he was still in prison, USCIS sent Kaufman a letter asking him to answer numerous questions and provide certain documents. The letter warned of the consequences of renouncing citizenship under the domestic-renunciation provision, including that "[r]enunciants who do not possess the nationality/citizenship of any country other than the United States, upon renunciation will become stateless persons." App. 64. "[S]uch renunciant[s]," the letter predicted, "may face extreme difficulties" when they attempt "traveling outside of the United States." *Id.* USCIS further cautioned that such stateless persons "may be taken into custody by the [DHS], and remain in custody pending removal proceedings and during the post-order removal period." *Id.* The letter closed by asking Kaufman if he still wanted to proceed. He responded that he did.

In May 2013, Kaufman was released from prison, subject to mandatory supervision in Wisconsin and other restrictions as a sex offender. Kaufman's terms of supervision required him to maintain or seek full-time employment, forbade him from leaving Wisconsin without permission from his supervisory agent, and restricted his travel outside the United States. Kaufman's supervision ended in January 2016.

In June 2013, USCIS asked Kaufman to provide additional information and reiterated the consequences that he would face if he became stateless in the United States. Kaufman provided the information and confirmed that he still wished to renounce his citizenship.

In October 2013, Kaufman attended an interview at USCIS's field office in Bloomington, Minnesota. Two USCIS officers asked Kaufman a number of questions under oath. Because USCIS had no experience in processing a renunciation, the questions were taken from forms used by the State Department, which had experience handling foreign-renunciation requests in its overseas consular offices. *See* 8 U.S.C. § 1481(a)(5).

In response to the officers' questions, Kaufman explained that he understood that if he were to lose his U.S. citizenship without acquiring the nationality of another country, he would become stateless. When asked if he intended to "retain the right to continue to live in the U.S.," Kaufman said "no." App. 31. The officers told him that he would become an alien after losing his citizenship and asked if he had obtained a visa certification that would allow him to remain in the United States as an alien. Kaufman said he had not because he intended to leave the country. The officers also asked Kaufman about his departure plans. Although Kaufman had saved several thousand dollars,

researched various countries, and corresponded with several of them, he had not secured entry into another country. Kaufman explained that he did not believe he could obtain a U.S. passport because he could not profess allegiance to the United States.

When asked how he would leave the United States without a passport, Kaufman said he hoped the United States would ultimately issue him the travel documents applicable to stateless persons. The officers asked him how he could leave the country despite his community-supervision restrictions in Wisconsin, and Kaufman suggested that the state would likely "go along" with the federal government if he were permitted to depart the country. App. 143. Before leaving the field office, Kaufman signed a formal statement confirming that he understood the consequences of relinquishing his citizenship and that he freely and intentionally chose to do so.

B

In March 2014 Leslie D. Tritten, director of the USCIS field office, sent Kaufman a letter denying his renunciation request. *See* Letter from Leslie D. Tritten, Field Office Director, USCIS St. Paul Field Office, to James Kaufman (Mar. 21, 2014) (the "Tritten Letter"), App. 10-17. Tritten found that Kaufman had failed to show by a preponderance of the evidence that he had the requisite "intention" to relinquish his citizenship under the domestic-renunciation provision.

Interpreting the "intention" requirement, Tritten concluded that a person cannot intend to renounce his citizenship "while simultaneously intending to exercise a fundament[al] right of citizenship, such as continuing to reside

in the United States."[2] App. 14. To determine if a person intends to continue exercising the right of residency, USCIS looks to "whether the renunciant genuinely and credibly intends to sever ties with the United States and relocate to a foreign country, and how he plans to accomplish that end." App. 14.

Applying this interpretation, Tritten determined Kaufman did not have the requisite intention to renounce his citizenship. Although Tritten acknowledged Kaufman's personal desire to leave the United States, she nevertheless concluded that he failed to present a credible plan for departing the country after renouncing his citizenship. Specifically, Tritten noted that Kaufman provided no evidence that he could leave the country while still under mandatory supervision in Wisconsin. In addition, Kaufman failed to show a credible plan for exiting the United States or lawfully gaining entry into another country as a stateless convicted felon. For these reasons, Tritten concluded that Kaufman would continue exercising a right of citizenship (residency), which is inconsistent with an intention of relinquishing citizenship.

Kaufman brought a claim in district court of unlawful agency action under the APA, 5 U.S.C. § 706(2)(A). The court granted summary judgment for USCIS. *See Kaufman v. Johnson*, 170 F. Supp. 3d 71 (D.D.C. 2016). The court did not directly address the meaning of the "intention" requirement nor whether the Tritten Letter's interpretation of the domestic-

---

[2] The parties use the words "intention" and "intent" interchangeably, and we follow that practice here. *See A Dictionary of Modern Legal Usage* 458 (Bryan A. Garner ed., 2d ed. 1995) ("If any distinction may be drawn between *intent* and *intention*, it must be connotative . . . . This distinction has not been fossilized in the language . . . . Euphony usually governs the choice of word.").

renunciation provision warrants deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Instead, the court found that Kaufman's community supervision in Wisconsin "clashed completely with his purported intent to sever all ties to the United States and to leave the country immediately." *Kaufman*, 170 F. Supp. 3d at 74. The court concluded that the administrative record contained ample support for the conclusion that Kaufman's "speculative exit plan was neither plausible nor credible." *Id.*

## II

Kaufman timely appealed the district court's judgment, and we directed the appointment of amicus curiae. The district court had jurisdiction under 28 U.S.C. § 1331, and we have jurisdiction under 28 U.S.C. § 1291.

The APA requires us to hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). We review USCIS's "administrative action directly, according no particular deference to the judgment of the [d]istrict [c]ourt." *Holland v. Nat'l Mining Ass'n*, 309 F.3d 808, 814 (D.C. Cir. 2002).

We often review an agency's interpretation of a statute it is charged with implementing under the framework of *Chevron. See Mylan Labs., Inc. v. Thompson*, 389 F.3d 1272, 1279 (D.C. Cir. 2004) (citing *Chevron*, 467 U.S. 837). Under that framework, we first determine whether Congress "has directly spoken to the precise question at issue," in which case we "give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. If the statute is "silent

or ambiguous," we consider "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

But not all agency interpretations fall within *Chevron*'s framework. The Supreme Court has clarified that "[d]eference in accordance with *Chevron* . . . is warranted only 'when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.'" *Gonzales v. Oregon*, 546 U.S. 243, 255-56 (2006) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001)). In addition, we generally do not apply *Chevron* deference when the statute in question is administered by multiple agencies. *See, e.g.*, *DeNaples v. Office of Comptroller of Currency*, 706 F.3d 481, 487 (D.C. Cir. 2013); *Proffitt v. FDIC*, 200 F.3d 855, 860 (D.C. Cir. 2000).

An agency interpretation that falls outside *Chevron* "is 'entitled to respect' only to the extent it has the 'power to persuade.'" *Gonzales*, 546 U.S. at 256 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)); *see also Mead*, 533 U.S. at 234-35.

III

Before addressing the merits, we must resolve a threshold question. USCIS argues that Kaufman's claim is not ripe for review because he has now completed his community supervision in Wisconsin, which enables him to leave the country and attempt to renounce his citizenship while abroad. In essence, USCIS argues that Kaufman could make this litigation go away by pursuing the INA's *foreign*-renunciation

provision under § 1481(a)(5), instead of the *domestic*-renunciation provision under § 1481(a)(6).

Whether Kaufman could proceed as USCIS suggests is not relevant to ripeness analysis. In *Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967), the Supreme Court provided a two-pronged test for ripeness that first considers the "fitness of the issues" for judicial decision and then looks at any hardship that would befall the parties if the court withheld consideration. *Id.* at 149; *see also Venetian Casino Resort, LLC v. EEOC*, 409 F.3d 359, 364 (D.C. Cir. 2005).

Under the "fitness" prong, we first ask "whether the disputed claims raise purely legal questions and would, therefore, be presumptively suitable for judicial review." *Venetian Casino Resort*, 409 F.3d at 364 (quoting *Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86, 92 (D.C. Cir. 1986)). Kaufman's claim easily passes that test. He raises a purely legal question about the meaning of the statutory phrase, "intention of relinquishing United States nationality." Under the fitness prong, we also consider whether postponing review would allow the issue to take on a more definite form. *Id.* (citing *City of Houston v. Dep't of Hous. & Urban Dev.*, 24 F.3d 1421, 1430-31 (D.C. Cir. 1994)). Here, the issue is fully formed. Kaufman has clearly expressed a strong desire to relinquish his citizenship, although his circumstances suggest he would have difficulty leaving the United States. Similarly, there can be no question that USCIS definitively rejected Kaufman's request to relinquish his citizenship. The record before us squarely presents the question whether USCIS has properly interpreted the "intention" requirement.

The "hardship" prong is "largely irrelevant" in cases such as Kaufman's, in which "neither the agency nor the court ha[s]

a significant interest in postponing review." *Id.* at 365-66 (quoting *Elec. Power Supply Ass'n v. FERC*, 391 F.3d 1255, 1263 (D.C. Cir. 2004)). Here, USCIS has not argued that it has a significant interest in postponing review; it simply seeks to evade review by forcing Kaufman to rely on the foreign-renunciation provision. Even if the hardship prong played a larger role here, it would tilt in favor of Kaufman, who has been trying to renounce his citizenship for many years. For these reasons, we conclude that Kaufman's claim is ripe.

IV

The central dispute in this case regards USCIS's interpretation of the "intention" requirement of § 1481(a) and how it applies to the domestic-renunciation provision at § 1481(a)(6). Kaufman and the amicus claim the statute's text and structure show that "intention" means only the subjective desire of the renunciant. USCIS argues that in the domestic-renunciation context, "intention" means more than one's subjective desire; it also means having a credible plan for leaving the United States. USCIS further argues that its interpretation deserves deference under *Chevron*. We address the deference question first.

A

The Tritten Letter is not the type of agency interpretation that warrants *Chevron* deference. Both parties agree that the letter's interpretation and application of the domestic-renunciation provision was an "informal adjudication" of Kaufman's legal rights. Amicus Br. 25; USCIS Br. 16. An agency interpretation in an informal adjudication may warrant *Chevron* deference when it was "intended to have general applicability and the force of law." *Fox v. Clinton*, 684 F.3d 67,

78 (D.C. Cir. 2012). To determine if the interpretation was so intended, we rely on a series of factors outlined by the Supreme Court in *Barnhart v. Walton*, 535 U.S. 212, 221-22 (2002), and *United States v. Mead Corp.*, 533 U.S. at 231-34.

The parties largely dispute whether the Tritten Letter satisfies the *Barnhart* factors. Those factors are "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time." *Barnhart*, 535 U.S. at 222.

These factors weigh against affording *Chevron* deference here. The Tritten Letter did not reflect "careful consideration the Agency has given the question over a long period of time." Rather, USCIS itself admitted that its interpretation of "intention" was novel: "Until the decision in [Kaufman's] case, USCIS had summarily denied domestic renunciation requests on the ground that the U.S. was not in a state of war." *See* Tritten Letter, App. 12. It is also hard to credit the agency's claim to expertise in interpreting the word "intention." USCIS claims it incorporated the State Department's interpretation of the term, but as explained below, USCIS's interpretation is actually contrary to that of the State Department. Moreover, the Tritten Letter's interpretation appears to clash with USCIS's own prior statements to Kaufman when it repeatedly warned him that *if* he renounced his citizenship under the domestic-renunciation provision, *then* he would become stateless in the United States, have difficulty traveling, and might be detained pending removal. Under USCIS's interpretation now, however, those *consequences of* renunciation have been transformed into *barriers to* renunciation.

It is also difficult to claim that the letter from USCIS's field office was "clearly intended to have general applicability and the force of law" when the letter singularly focused on Kaufman. *Fox*, 684 F.3d at 78. On its face, the letter did "not purport to set policy for future . . . determinations," *id.*, and Tritten never suggested that the letter established the agency's general policy for the entire country. The Tritten Letter appears even less like a general policy because it was issued from one of USCIS's many field offices instead of its headquarters. *See Mead*, 533 U.S. at 233-34 (noting that agency adjudications coming from "scattered offices" as opposed to "Headquarters" carry less indicia of general applicability or having the "force of law").

Finally, any claim to *Chevron* deference is weaker still because USCIS is not the only agency charged with administering this statute. Recall that § 1481(a) includes seven different expatriating provisions through which one may relinquish citizenship. And these different expatriating provisions are administered by different agencies. For example, the foreign-renunciation provision at § 1481(a)(5) is administered by the State Department. The "intention" requirement, however, is lodged in § 1481(a) and applies to all seven subsections—and therefore to each agency administering one of the subsections. Because the "intention" requirement is administered by multiple agencies, any "[j]ustifications for deference begin to fall." *DeNaples*, 706 F.3d at 487. And although *some* statutes administered by multiple agencies may still permit *Chevron* deference, USCIS made no argument that § 1481(a) falls within this narrow class. *See id.*; *see also Collins v. Nat'l Transp. Safety Bd.*, 351 F.3d 1246, 1253 (D.C. Cir. 2003) (discussing three types of "shared-enforcement schemes" under which agencies are owed different forms of deference).

In sum, we conclude that the Tritten Letter does not warrant *Chevron* deference.

B

Absent *Chevron* deference, we afford USCIS's views "a respect proportional to its 'power to persuade,'" taking into account "the merit of its writer's thoroughness, logic and expertness, its fit with prior interpretations, and any other sources of weight." *See Mead*, 533 U.S. at 235 (quoting *Skidmore*, 323 U.S. at 140). Because Congress did not define the "intention" requirement, we presume it carries its ordinary meaning at the time the provision was enacted. *See Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012).

The intent element was added to § 1481(a) in 1986. *See* INA Amendments of 1986, Pub. L. No. 99-653, § 18, 100 Stat. 3655, 3658. Kaufman and the amicus draw on the then-current edition of *Black's Law Dictionary* (5th ed. 1979) to argue that the word "intent" means mental "resolve" or "determination" to do something. Oddly, USCIS never responds to this argument in its brief. Nevertheless, the parties' interpretive difference splits along fairly straightforward lines. Kaufman argues that intention is simply what he *wants to do—i.e.*, relinquish citizenship and its benefits—regardless of his ability to *actually accomplish* his desire by leaving the country. USCIS concedes that Kaufman wants to renounce his citizenship and relinquish the benefits thereof, but the agency argues that what he wants—his subjective intention—is insufficient to satisfy the domestic-renunciation provision if his desire is "objectively incredible or impractical." USCIS Br. 32.

Defining intent is notoriously difficult. *See A Dictionary of Modern Legal Usage* 458 (Bryan A. Garner ed., 2d ed. 1995) ("The general legal opinion . . . is that *intention* cannot be satisfactorily defined."). Given the amount of ink spilled over mental-state concepts like scienter and mens rea, it is unlikely intent has a single, uniform meaning across the U.S. Code. Federal law recognizes a number of different mental states that involve varying degrees of intentionality. *See, e.g.*, *Elonis v. United States*, 135 S. Ct. 2001, 2009-10 (2015) (discussing intent in a criminal context); *Ashcroft v. Iqbal*, 556 U.S. 662, 676-77 (2009) (discussing degrees of intent in a civil context). English-language dictionaries contain a wide range of definitions for "intention" and its variants. *See, e.g.*, 7 *The Oxford English Dictionary* 1072-74, 1078-80 (Simpson & Weiner eds., 1989). And respected legal dictionaries contain sometimes conflicting guidance. *Compare Ballentine's Law Dictionary* 646 (Anderson ed., 3d ed. 1969) (defining intention as "purpose"), *with A Dictionary of Modern Legal Usage*, *supra*, at 458, 720 (stating that some erroneously use "purpose" as a synonym for "intention"). Even the dictionary cited by the amicus contains several meaningfully different definitions of the term. *See Intent* and *Intention*, *Black's Law Dictionary* (5th ed. 1979). While this dictionary defines intent as the "determination with which [a] person acts," it also says that the term is used "to denote that the actor . . . believes that the consequences [of his act] are substantially certain to result from it." *Id.* In other words, "intent" may sometimes refer to expected real-world consequences instead of one's subjective desire. Thus, the isolated definition of "intention" cannot end our inquiry. Several traditional tools of construction, however, show that USCIS's interpretation is impermissible.

*First*, USCIS's interpretation is in tension with the statute's structure. As previously noted, § 1481(a) has seven

subparts listing different expatriating acts that provide separate routes for loss of citizenship. For subparts one through five, § 1481(a)(1)-(5), loss of citizenship cannot be completed while within the United States. Section 1483(a) states that for a citizen performing one of these five expatriating acts while within the United States, his loss of citizenship is incomplete until he "takes up a residence outside the United States."[3] For example, under § 1481(a)(1) an adult U.S. citizen may relinquish his citizenship if he, voluntarily and with the intention of relinquishing his citizenship, obtains "naturalization in a foreign state upon his own application." But if a citizen undertook those steps *within* the United States, § 1483(a) would require him first to take up residency *outside* the country before his loss of citizenship would be complete.

This statutory context is important because Congress expressly exempted the domestic-renunciation provision from § 1483(a)'s generally applicable foreign-residency requirement. In other words, Congress went out of its way to clarify that renunciations on U.S. soil *do not* include the prerequisite that a citizen "take[] up a residence outside the United States." Yet USCIS's interpretation of § 1481(a)(6) would almost duplicate that requirement by reading it into § 1481(a)'s general "intention" requirement. *See* Tritten Letter, App. 14 ("USCIS requires proof of credible plans to depart

---

[3] Section 1483(a) states in whole: "Except as provided in paragraphs (6) and (7) of section 1481(a) of this title, no national of the United States can lose United States nationality under this chapter while within the United States or any of its outlying possessions, but loss of nationality shall result from the performance within the United States or any of its outlying possessions of any of the acts or the fulfillment of any of the conditions specified in this Part if and when the national thereafter takes up a residence outside the United States and its outlying possessions."

from the United States and gain entrance to a foreign nation following renunciation for purposes of taking up residence outside the United States, and by means not predicated upon U.S. citizenship, which the renunciant would not possess at that time."). That reading is in tension with the statutory framework. Congress attached a foreign-residency requirement to most portions of § 1481(a) but specifically excluded the domestic-renunciation provision. We may not circumvent that choice through an inventive interpretation of "intention."

*Second*, USCIS's interpretation rests on a faulty premise. USCIS argues that Kaufman does not intend to relinquish his citizenship because he will likely continue exercising a right of citizenship (residency) even after his relinquishment. This is so, USCIS says, because at the time Kaufman attempted to relinquish his citizenship he was under community supervision in Wisconsin and had no credible plan for departing the country. Because Kaufman would be unable to leave the country after relinquishing his citizenship, USCIS argues that he would remain physically present in the United States and thus continue exercising a citizen's right of residency.

USCIS's reasoning is unsound because one's mere physical presence in the United States does not require exercising a right of citizenship. Many people who are physically present in the United States are not exercising the right of U.S. citizenship. Consider a visa holder visiting the United States. While her visa is valid, she is both physically present in the United States and exercising a legal right of residency—though not a right of U.S. citizenship. If she overstays her visa, however, she will lose the legal right of residency even though she remains physically present in the United States. Both before and after she loses her visa, her

physical presence in the United States is not an exercise of a right of U.S. citizenship.

USCIS wrongly assumes that Kaufman's ongoing presence in the United States after his renunciation must be a continued exercise of his right of residency as a citizen. But after his renunciation, Kaufman's ongoing physical presence in the country would be no more an exercise of the right of residency than it would be for the holder of the expired visa. Instead, Kaufman would become a stateless person subject to detention for his unlawful presence in the United States.[4] Kaufman has repeatedly shown that he knows these consequences and nonetheless seeks to expatriate under the domestic-renunciation provision.

USCIS attempts to support its argument by relying on *Lozada Colon v. Department of State*, 2 F. Supp. 2d 43 (D.D.C. 1998), *aff'd*, 170 F.3d 191 (D.C. Cir. 1999). In *Lozada Colon*, a U.S. citizen born in Puerto Rico sought to renounce his citizenship under the foreign-renunciation provision (what is

---

[4] *See* Letter from USCIS Field Operations Directorate to James Kaufman (June 5, 2013), App. 45, 52-53 ("Renunciants who do not possess the nationality/citizenship of any country other than the United States, upon renunciation will become stateless persons, not lawful permanent residents of the United States, thus lacking lawful status in the United States . . . . In accordance with the immigration laws, an individual who does not have lawful immigration status may be taken into custody by the Department of Homeland Security, and remain in custody pending removal proceedings and during the post-order removal period."); Letter from Debra Rogers, Assoc. Director, USCIS Field Operations Directorate, to James Kaufman (Sept. 24, 2010), App. 64 (same); *see also* Letter from USCIS Field Operations Directorate to James Kaufman (Aug. 26, 2013), App. 43-46 (similar). *See generally Zadvydas v. Davis*, 533 U.S. 678 (2001).

now § 1481(a)(5)) while he was in the Dominican Republic. *Id.* at 44. However, Lozada Colon planned on remaining a resident of Puerto Rico and in fact returned there after renouncing his citizenship. The district court concluded that "while claiming to renounce all rights and privileges of United States citizenship, Plaintiff *wants* to continue to exercise one of the fundamental rights of citizenship, namely the right to travel freely throughout the world and when he wants to, to return and reside in the United States." *Id.* at 46 (emphasis added).

This is readily distinguishable from Kaufman's case. Lozada Colon *wanted* to exercise rights of citizenship, such as traveling freely to and from the United States. His desire to continue living in Puerto Rico suggested that he did not understand the significance of relinquishing U.S. citizenship, casting doubt on his intention. Not so with Kaufman. Kaufman does not want to continue living in the United States nor to travel to and from the country. Whereas Lozada Colon's future residency plans suggested a defect in his "intent," neither this court nor USCIS has any doubts about Kaufman's desire. *See* USCIS Br. 31-32 ("[Kaufman] has unambiguously expressed his subjective intent to renounce United States citizenship.").

*Third*, and relatedly, USCIS purports to adopt the State Department's interpretation of the intention requirement, but it misconstrues the State Department's approach. *See* Tritten Letter, App. 12-14. In short, when a potential overseas renunciant suggests he *wishes* to return to the United States, the State Department begins to question his intent; when a potential domestic renunciant expresses *no wish* to stay in the United States but is unable to leave, USCIS uses these factual circumstances as a bar to renunciation.

In administering the INA's foreign-renunciation provision, § 1481(a)(5), the State Department defines intent as "the will to surrender citizenship" or "the conscious purpose to surrender citizenship." 7 Foreign Affairs Manual § 1225.2(a), U.S. State Dep't (Aug. 26, 2014) ("State Department Manual"). This is a subjective analysis that looks at the "totality of the circumstances" to determine if "the individual intended to relinquish citizenship at the time of the expatriating act." *Id.* § 1225.2(b)(2). The State Department Manual repeatedly asserts, "There is rarely a question of intent in renunciation cases, as the oath of renunciation itself is strong proof of intent." *Id.* § 1225.1(d); *see also id.* § 1226(c); *id.* § 1261(e). However, it notes that precautions must be taken for renunciants who "*wish* to" retain the right to reside in the United States. *Id.* § 1261(h) (emphasis added). For these renunciants, as with Lozada Colon, the State Department questions their intent because their desire to retain the right of residency evinces a possible misunderstanding of the consequences of losing U.S. citizenship. But even then, the State Department Manual goes on to say, "If a potential renunciant understands the loss of the right to residency and chooses to become stateless nonetheless, the consular officer handling the case should allow him or her to do so." *Id.* Kaufman has made clear that he understands the consequences of forfeiting his citizenship and has chosen to do so nonetheless.

\* \* \*

We do not hold today that USCIS must grant Kaufman's renunciation request. Nor do we purport to set forth an exhaustive definition of § 1481(a)'s "intention" requirement. We simply hold that the Tritten Letter's interpretation of that term is impermissible.

We understand that a successful domestic renunciation by Kaufman may have troublesome implications, as both parties acknowledge. If Kaufman is able to renounce his citizenship, he would become stateless inside the United States, and statelessness poses serious concerns both domestically and internationally. *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1696-97 (2017). After forfeiting his lawful status in this country, DHS could detain Kaufman for as long as six months, and potentially much longer, pending efforts to deport him. *See Zadvydas v. Davis*, 533 U.S. 678, 701-02 (2001).

USCIS is understandably concerned about stateless detainees. *See* Tritten Letter, App. 15 n.8 ("Removal of a stateless former U.S. citizen within the United States with no ties to any foreign country thus may prove impossible. Such an individual instead would become a public burden, and particularly a burden on the immigration enforcement infrastructure of the United States . . . ."). But as legitimate as those concerns may be, USCIS may not set aside the text of the statute simply because "it leads to undesirable consequences in some applications." *Friends of the Earth, Inc. v. EPA*, 446 F.3d 140, 145 (D.C. Cir. 2006).

V

For the foregoing reasons we reverse the judgment below and remand this case to the district court with instructions to vacate USCIS's final decision provided in the Tritten Letter and to remand this case to the agency for further proceedings.

*So ordered.*