(Slip Opinion)

# Authority of the Special Inspector General for Pandemic Recovery to Oversee Programs Established Under the CARES Act

The jurisdiction of the Special Inspector General for Pandemic Recovery is limited to oversight of programs established under the Coronavirus Economic Stabilization Act of 2020.

April 29, 2021

MEMORANDUM OPINION FOR THE ACTING GENERAL COUNSEL
DEPARTMENT OF THE TREASURY, AND THE
SPECIAL INSPECTOR GENERAL FOR PANDEMIC RECOVERY

The Coronavirus Aid, Relief, and Economic Security Act, or CARES Act, provided over $2 trillion of financial assistance to individuals and entities affected by the coronavirus disease 2019 ("COVID-19") pandemic. Pub. L. No. 116-136, 134 Stat. 281 (2020). The CARES Act is a complex, omnibus public law, which spans over 300 pages and is divided into two divisions, A and B. Division A is composed of six titles, many of which are further divided into subtitles, parts, and subparts. It contains 186 provisions, amending over 25 federal statutes and affecting the authorities of over a dozen federal agencies. Four of the subtitles in Division A have their own short titles that denominate them as distinct "Acts" within the division. Division B provided certain supplemental appropriations to federal agencies to fund discretionary spending related to the pandemic.

As relevant here, subtitle A of title IV of Division A of the CARES Act established the separately titled Coronavirus Economic Stabilization Act of 2020 ("CESA"), which provided $500 billion to the Department of the Treasury ("Treasury") to make loans, loan guarantees, and other investments in support of eligible businesses and entities.[1] *Id.* §§ 4001–4029

---

[1] CESA also provided additional relief for certain industries and individuals, such as a suspension of some aviation excise taxes, *id.* § 4007, regulatory relief for financial institutions, *id.* §§ 4012–4014, and forbearance options and stays of foreclosure and eviction with respect to properties that are subject to federally-backed mortgage loans, *id.* §§ 4022–4024. Congress later rescinded most of the funding for CESA's $500 billion loan program and made conforming amendments to CESA. *See* Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, div. N, § 1003, 134 Stat. 1182, 2145 (2020). These

(codified at 15 U.S.C. §§ 9041–9063). Section 4018 of CESA established the Office of the Special Inspector General for Pandemic Recovery ("SIGPR") within Treasury, which the section authorizes to "conduct, supervise, and coordinate audits and investigations of the making, purchase, management, and sale of loans, loan guarantees, and other investments made by the Secretary of the Treasury under any program established by the Secretary under *this Act*, and the management by the Secretary of any program established under *this Act*." *Id.* § 4018(c)(1) (emphases added). Section 4018 accordingly limits the SIGPR's jurisdiction to oversight of programs established under "this Act." The section, however, does not specify the "Act" to which it refers.

We have been asked whether section 4018 confers jurisdiction on the SIGPR to oversee two programs that were not established under CESA: the Payroll Support Program established under subtitle B of title IV of Division A, CARES Act §§ 4111–4120, and the Coronavirus Relief Fund established under title V of Division A, *id.* § 5001. The SIGPR maintains that the term "this Act" in section 4018 refers to the entirety of Division A of the CARES Act. *See* Memorandum for the General Counsel, Secretary of the Treasury, from Brian D. Miller, Special Inspector General for Pandemic Recovery, *Re: Response to the Treasury OIG's Request for a Decision Establishing Exclusive Jurisdiction: If Intervention is Needed to Resolve SIGPR's Invitation to Jointly Work Programs with Concurrent Jurisdiction Under a Task Force Model, the Office of Legal Counsel Should Decide Jurisdiction* (Jan. 7, 2021) ("SIGPR Memo"). Relying on this interpretation, the SIGPR asserts jurisdiction to oversee the Payroll Support Program and the Coronavirus Relief Fund. Treasury's Office of Inspector General ("TIG"), on the other hand, interprets "this Act" in section 4018 to refer only to CESA, and therefore maintains that TIG has exclusive jurisdiction to oversee those two programs, rather than sharing concurrent jurisdiction with the SIGPR. *See* Memorandum for the Assistant Inspector General for Audit from A. Altemus, Office of Counsel, Office of Inspector General, *Re: Inspector General Jurisdiction/Potential ADA Violation* (Jan. 15, 2021) ("TIG Memo").[2]

---

amendments did not affect the SIGPR's authority to oversee loans, loan guarantees, or other investments made before the rescission. *See id.* § 1003(a)(2)(C)(ii).

[2] We also consulted the Office of Management and Budget's Office of General Counsel on this issue, which agreed with TIG's interpretation of section 4018. *See* E-mail for

It is appropriate for our Office to decide this issue. The SIGPR requested that we "resolve this intra-agency disagreement," and the Acting General Counsel of Treasury also stated that Treasury would appreciate receiving our advice.[3] TIG requested that the Comptroller General provide an opinion on this question.[4] Although Comptroller General opinions provide helpful guidance on appropriations matters and related issues, such opinions are not binding on the Executive Branch because the Comptroller General is an agent of Congress. *See Prioritizing Programs to Exempt Small Businesses from Competition in Federal Contracts*, 33 Op. O.L.C. 284, 302–03 (2009); *see also Bowsher v. Synar*, 478 U.S. 714, 727–32 (1986). And we have no control over the timing of any opinion that the Comptroller General might issue, helpful though such an opinion might be. Our Office can resolve the dispute because we exercise the delegated authority of the Attorney General to advise the heads of executive departments, *see* 28 U.S.C. § 512, and we have previously used this authority to resolve intra-agency disputes upon the request of an agency head or her delegate, such as the General Counsel, *see, e.g.*, *Special Master for Troubled Asset Relief Program Executive Compensation*, 34 Op. O.L.C. 219 (2010).

---

Daniel L. Koffsky, Deputy Assistant Attorney General, Office of Legal Counsel, from Heather V. Walsh, Deputy General Counsel, Office of Management and Budget, *Re: An Additional Question* (Mar. 26, 2021, 6:14 PM) ("OMB E-mail").

[3] *See* Letter for Steven A. Engel, Assistant Attorney General, Office of Legal Counsel, from Brian D. Miller, Special Inspector General for Pandemic Recovery (Jan. 14, 2021); E-mail for Daniel L. Koffsky, Deputy Assistant Attorney General, Office of Legal Counsel, from Laurie S. Schaffer, Acting General Counsel, Department of the Treasury (Feb. 5, 2021, 9:28 AM).

[4] *See* Letter for Tom Armstrong, General Counsel, Government Accountability Office, from Richard K. Delmar, Deputy Inspector General, Department of the Treasury (Jan. 15, 2021). In addition to questioning the meaning of "this Act" in section 4018, TIG contends that the SIGPR's oversight of any program established outside of CESA would involve an impermissible use of an appropriation. *See* TIG Memo at 6–7. The SIGPR has an available appropriation to carry out activities authorized by section 4018. *See* CARES Act § 4018(g). If section 4018 authorized the SIGPR to oversee programs established outside of CESA, the SIGPR's oversight of such programs would not constitute an impermissible use of an appropriation. *See EPA Assessment of Penalties Against Federal Agencies for Violation of the Underground Storage Tank Requirements of the Resource Conservation and Recovery Act*, 24 Op. O.L.C. 84, 90 (2000) (noting that an expenditure "must make a direct contribution to carrying out either a specific appropriation or an authorized agency function for which more general appropriations are available" (quotation marks omitted)).

For the reasons that follow, we conclude that, although the question is close, the phrase "this Act" in section 4018 refers to CESA and not to Division A of the CARES Act more generally. Section 4018 accordingly limits the SIGPR's jurisdiction to oversight of programs established under CESA.

## I.

We first consider whether section 3 of the CARES Act resolves the meaning of "this Act" in section 4018. In full, section 3 requires that "[e]xcept as expressly provided otherwise, any reference to 'this Act' contained in any division of this Act shall be treated as referring only to the provisions of that division." The SIGPR contends that this provision establishes a default rule that, unless expressly provided otherwise, references to "this Act" in the CARES Act mean the *entirety* of the pertinent division—i.e., *all of* either Division A or Division B. *See* Memorandum from the Office of the Special Inspector General for Pandemic Recovery, *Re: Response to OLC's Inquiry Regarding SIGPR's Jurisdiction* (Mar. 26, 2021) ("SIGPR Supp. Memo"). We believe, however, that section 3 more narrowly establishes a default rule that references to "this Act" refer to *no more than*, but not necessarily all of, the pertinent division. In other words, section 3 generally precludes treating references to "this Act" in Division A as including Division B, and vice versa, but it does not preclude treating the term "this Act" to mean less than an entire division, such as where, as here, a reference to "this Act" appears in a distinct, denominated "Act" *within* a division.

The heading of section 3 describes it as a "References" provision, and the text sets out a rule for how the term "this Act" "shall be treated." Thus, unlike numerous "Definitions" provisions throughout the CARES Act that set out what certain terms "mean," *see, e.g.*, CARES Act § 1101(1) ("[T]he terms 'Administration' and 'Administrator' mean the Small Business Administration and the Administrator thereof, respectively."), section 3 does not purport to establish an exhaustive definition of "this Act," but instead establishes a special rule regarding the term: that use of the term within any division of the CARES Act "shall be treated as referring only to the provisions of that division."[5]

---

[5] "References" provisions in other statutes also set out special rules relating to the pertinent terms but do not purport to define them. *See, e.g.*, 26 U.S.C. § 1397B(b)(1)(B)

The language of this special rule is ambiguous. As the SIGPR explains, the article "the" "indicat[es] that a following noun or noun equivalent is definite or has been previously specified by context." SIGPR Supp. Memo at 3 (quoting *Nielsen v. Preap*, 139 S. Ct. 954, 965 (2019)). Section 3's reference to "*the* provisions of that division" therefore could be understood to refer to a definite set of provisions, which in this case would be all of the provisions of the pertinent division. The language of section 3 therefore could be read to require that references to "this Act" be treated as referring to all of the provisions of the pertinent division (and only the provisions of the pertinent division).

But the language of section 3 could also be read, quite naturally, to require that references to "this Act" be treated as referring to no more than, but not necessarily all of, the provisions of the pertinent division. While not dispositive, the section's use of the term "only" is consistent with this narrower interpretation. The word "only" in this context means "solely, merely, exclusively," "nothing but," or "nothing more or else than." 10 Oxford English Dictionary 818 (2d ed. 1989). The use of the term "only" in a statute thus ordinarily "has the purpose and effect of excluding the remaining universe." *Farrell v. Comm'r*, 136 F.3d 889, 895 (2d Cir. 1998); *see* J.D. Shambie Singer, 3 *Sutherland's Statutes and Statutory Construction* § 57:8 (8th ed. 2018) ("Legislatures may signal [an exclusive] intent by using the word 'only.'"). The word "only" in section 3 therefore suggests that the function of the section is to *limit* the meaning of references to "this Act" to the pertinent division, rather than to *expand* the meaning of such references to the entire division.

Suppose a provision stated that "any reference to the 'Kansas City area' shall be treated as referring only to the jurisdictions of the State of Kansas." This provision would exclude from the meaning of "Kansas City area" any jurisdiction of Missouri. But it would not necessarily be read to *define* "Kansas City area" to mean "the jurisdictions of the State of Kansas," therefore requiring that all jurisdictions within Kansas, regardless of their distance from Kansas City, be treated as part of the "Kansas City

---

("Any reference in this paragraph to section 1400F shall be treated as reference to such section before its repeal."); *id.* § 6103(b)(5)(B)(ii) ("For purposes of applying subparagraph (A)(iii) to the subsections referred to in such subparagraph, any reference in such subsections to State law, proceedings, or tax returns shall be treated as references to the law, proceedings, or tax returns, as the case may be, of the municipalities which form and operate the governmental entity referred to in such subparagraph.").

area." *Cf. Groman v. Comm'r of Internal Revenue*, 302 U.S. 82, 86 (1937) ("[T]he section is not a definition but rather is intended to enlarge the connotation of the term 'a party to a reorganization' to embrace corporations whose relation to the transaction would not in common usage be so denominated or as to whose status doubt might otherwise arise."). The scope of the "Kansas City area" within Kansas instead would be determined by other features of the statute's text, structure, and purpose. Similarly, section 3's requirement that references to "this Act" be treated as referring "only to the provisions of that division" clearly excludes from the meaning of "this Act" provisions outside the pertinent division, but it does not necessarily define "this Act" to mean all of the provisions of the pertinent division.

The narrower interpretation of section 3 of the CARES Act is consistent with the inclusion of provisions identical to section 3 of the CARES Act ("express-reference provisions") in consolidated appropriations statutes over the past two decades. *Cf. Erlenbaugh v. United States*, 409 U.S. 239, 243 (1972) ("The rule of *in pari materia*—like any canon of statutory construction—is a reflection of practical experience in the interpretation of statutes: a legislative body generally uses a particular word with a consistent meaning in a given context."). Consolidated appropriations statutes incorporate appropriations bills for individual agencies or a small group of related agencies as separate divisions, which are often denominated as distinct "Acts" within the larger pieces of legislation. *See, e.g.*, Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, div. A, 134 Stat. 1182, 1234 (2020) ("CAA 2021") ("This division may be cited as the 'Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 2021.'"). Since the late 1990s, Congress has typically passed each fiscal year at least one consolidated appropriations statute. *See* James V. Saturno and Jessica Tollestrup, Cong. Research Serv., *Omnibus Appropriations Acts: Overview of Recent Practice* 2–3 (Jan. 14, 2016).

The consolidated appropriations statutes before fiscal year 2003 did not contain express-reference provisions like section 3 of the CARES Act, and the omission sometimes created confusion about whether an appropriations restriction (or "rider") in one portion of the statute applied to other parts of the statute—i.e., to appropriations for unrelated agencies, as to which the restriction would make little sense—merely because the restriction generally referred to "this Act." *See, e.g.*, The Effect of an Ap-

*propriations Rider on the Authority of the Justice Department to File a Supreme Court Amicus Brief*, 14 Op. O.L.C. 13, 16 (1990) ("*Effect of Appropriations Rider*") (concluding that a rider referring to "this Act," contained in a portion of the statute appropriating funds to the Federal Communications Commission, did not apply to the Department of Justice, which was covered by a separate part of the statute, in part because "[i]t would be odd indeed for Congress to condition one agency's appropriations on compliance by other agencies with enacted prohibitions"). Since 2003, the inclusion of express-reference provisions in consolidated appropriations statutes has been standard practice.[6] These express-reference provisions avoid such confusion by creating, as the SIGPR puts it, a "firewall" between the divisions of these statutes. SIGPR Supp. Memo at 7. The narrower interpretation of section 3 of the CARES Act as a *restrictive* command therefore is consistent with the primary function of these now-common express-reference provisions.

The broader interpretation of section 3, however, is not supported by the inclusion of express-reference provisions in consolidated appropriations statutes. To the contrary, the Office of Management and Budget ("OMB") informs us that Congress has "habitually used the phrase 'this Act' [in consolidated appropriations statutes with express-reference provisions] where it intended to refer to the act referenced in the short title and not the division as a whole."[7]

For example, OMB points to title XII of Division FF of CAA 2021, which established the Horseracing Integrity and Safety Act of 2020 ("HISA"). CAA 2021, div. FF, § 1201, 134 Stat. 3252. HISA authorizes the Horseracing Integrity and Safety Authority to "commence a civil action against a covered person or racetrack that has engaged, is engaged, or is about to engage, in acts or practices constituting a violation of *this Act* or any rule established under *this Act*." *Id.* § 1205(j)(1) (emphases added). It seems unlikely that Congress intended the references to "this Act" in this provision to refer to the entirety of Division FF—which contains *21 titles and 25 short titles*—rather than only to HISA. Section

---

[6] *See, e.g.*, Consolidated Appropriations Resolution, 2003, Pub. L. No. 108-7, § 3, 117 Stat. 11, 12 (2003) ("Except as expressly provided otherwise, any reference to 'this Act' contained in any division of this of this joint resolution shall be treated as referring only to the provisions of that division."); *see* 1 U.S.C. § 1 note (collecting references).

[7] OMB E-mail.

306 of subtitle A of title III of Division FF, for instance, authorizes the President to block the property of foreign nationals involved in the hostage-taking or unlawful detention of Americans abroad, *id.* § 306(b)(2), and provides that "[a] person that violates, attempts to violate, conspires to violate, or causes a violation of subsection (b)(2) or any regulation, license, or order issued to carry out that subsection shall be subject to" certain penalties, *id.* § 306(d).[8] It would be absurd to interpret "this Act" in section 1205 to include this portion of Division FF.

Indeed, in the very first consolidated appropriations statute in which an express-reference provision appeared—the consolidated appropriations statute for fiscal year 2003, *see* Consolidated Appropriations Resolution, 2003, Pub. L. No. 108-7, § 3, 117 Stat. 11, 12 (2003) ("CAR 2003")—there were numerous provisions that would have made little sense if "this Act" were treated as referring to an entire division. For example, title V of Division F established the National Forest Organizational Camp Fee Improvement Act of 2003, and it described the purpose of "this Act" as "establish[ing] a land use fee system that provides for an equitable return to the Federal Government for the occupancy and use of National Forest System lands by organizational camps that serve young people or individuals with a disability," *id.* div. F, § 502(b), 117 Stat. at 294, and defined the "Secretary" for purposes of "this Act" to mean the Secretary of Agriculture, *id.* § 502(c)(2). These references to "this Act" plainly meant the National Forest Organizational Camp Fee Improvement Act of 2003 and not the entirety of Division F, which contained appropriations for other agencies besides the Department of Agriculture.[9]

---

[8] In addition, section 1202 of HISA defines "Commission" for purposes of "this Act" to mean the Federal Trade Commission. *Id.* § 1202(3). Yet other titles in Division FF use the term "Commission" to refer to other entities. *See, e.g.*, *id.* § 901(b)(1) ("[T]he Consumer Product Safety Commission (referred to in this Act as the 'Commission') shall promulgate a final rule to require[.]").

[9] Other provisions of CAR 2003 also would appear to be nonsensical if "this Act" referred to the entire division the reference was within, such as provisions in divisions containing appropriations for several agencies that gave one agency head transfer or other authority over funds appropriated in "this Act," *see, e.g.*, CAR 2003, div. A, § 704 ("The Secretary of Agriculture may transfer unobligated balances of funds appropriated by this Act or other available unobligated balances of the Department of Agriculture to the Working Capital Fund[.]"), or that conditioned the expenditure of funds under "this Act" on the action of one agency head, *see, e.g.*, *id.* div. I, tit. I ("[N]one of the funds in this Act may be used for operating expenses and capital projects not approved by the Secre-

The CARES Act displays an analogous structure to these consolidated appropriations statutes, and we see nothing in its statutory context or structure suggesting that section 3 of the CARES Act should be interpreted more broadly than the identical express-reference provisions in consolidated appropriations statutes. As noted above, the CARES Act is divided into two divisions, and Division A constitutes the bulk of the statute. Specifically, Division A is composed of six titles, I through VI, many of which are further divided into subtitles, parts, and subparts. Four subtitles in Division A, including CESA, have their own short titles that denominate them as distinct "Acts."[10] In light of the breadth of Division A and the establishment of these distinct "Acts" within the division, it seems unlikely that Congress intended section 3 of the CARES Act to create a default rule that all instances of "this Act"—even those that appear within a separate, denominated "Act"—would refer to the entirety of the pertinent division.

Employing the broader interpretation of section 3, moreover, could create at least one incongruity, similar to those that would have arisen for consolidated appropriations statutes if the broader interpretation had been employed there. Section 3402 of part IV of subtitle A of title III of Division A provides that "[n]ot later than 1 year after the date of enactment of this Act, the Secretary of Health and Human Services (*referred to in this Act as the 'Secretary'*) . . . shall develop a comprehensive and coordinated plan with respect to the health care workforce development programs of the Department of Health and Human Services." CARES Act § 3402(a)(1). If section 3402's reference to "this Act" meant the entirety of Division A, it would suggest that all references to "the Secretary" throughout Division A refer to the Secretary of Health and Human Services. But other provisions in Division A plainly use the term "Secretary" to refer to the Secretaries of other agencies. *See, e.g.*, *id.* § 2102 (defining "Secretary" to mean the Secretary of Labor for purposes of the

---

tary of Transportation nor on the National Railroad Passenger Corporation's fiscal year 2003 business plan.").

[10] CARES Act § 2101 ("This subtitle may be cited as the 'Relief for Workers Affected by Coronavirus Act'."); *id.* § 3001 ("This subtitle may be cited as the 'Coronavirus Aid, Relief, and Economic Security Act'."); *id.* § 3501 ("This subtitle may be cited as the 'COVID–19 Pandemic Education Relief Act of 2020'."); *id.* tit. IV, subtit. A ("This subtitle may be cited as the 'Coronavirus Economic Stabilization Act of 2020'."). Title I of Division A is also titled the "Keeping American Workers Paid and Employed Act."

subtitle). Although this statutory conflict would not be irreconcilable, the better construction of the CARES Act is one that avoids creating the conflict in the first place. *See United States v. Raynor*, 302 U.S. 540, 547 (1938) ("A construction that creates an inconsistency should be avoided when a reasonable interpretation can be adopted which will not do violence to the plain words of the act, and will carry out the intention of Congress.").[11]

To be sure, prior opinions of this Office and of the Comptroller General, relying upon section 3 of the CARES Act or identical express-reference provisions in consolidated appropriations statutes, have described certain references to "this Act" as meaning the division within which the reference appeared.[12] The narrower interpretation of section 3 of the CARES Act is consistent with these opinions, however. In many, or even perhaps most, instances, a reference to "this Act" within a division of such statutes may sensibly be understood to mean the entire division, particularly where there are no distinct "Acts" contained in that division.

---

[11] A few other references to "this Act" within Division A also appear to most naturally be read to refer to a subset of Division A and not the entire division. *See, e.g.*, CARES Act § 2102(e) ("Notwithstanding State law, for purposes of assistance authorized under this section, compensation under this Act shall be made to an individual otherwise eligible for such compensation without any waiting period."). Noting references in the CARES Act to "this subtitle," "this section," and "this subsection," the SIGPR argues that Congress knows how to "specify what it intends," and that "the best interpretation, therefore, is to read references to units at a particular level of organization as referring to the whole of those units—not as referring, potentially, only to a subset of them." SIGPR Supp. Memo at 6 & n.20. This argument assumes, however, that Congress intended section 3 to define references to "this Act" to mean a "particular level of organization," i.e., their division, rather than to limit the references to, at most, their division.

[12] *See, e.g.*, GAO, *Letter Regarding Report of Special Inspector General for Pandemic Recovery*, B-332417, at 1–2 (Aug. 10, 2020) (stating that "[w]e agree with SIGPR's understanding that the phrase "this Act" refers only to Division B under the rule of construction in section 3" of the CARES Act); *Application of the Hyde Amendment to Federal Student-Aid Programs*, 45 Op. O.L.C. __, at *4 (Jan. 16, 2021) (citing express-reference provision for the proposition that "[t]he relevant 'Act' in this case is division H of the legislation"); *Authority of the Department of Justice to Disclose Statutorily Protected Materials to Its Inspector General in Light of Section 540 of the Commerce, Justice, Science, and Related Agencies Appropriations Act, 2016*, 40 Op. O.L.C. 1, 8 (2016) (similar); GAO, *State Department—Assistance for Lebanon*, B-303268, at 7 n.10 (Jan. 3, 2005) (similar).

This does not undermine our conclusion that section 3 of the CARES Act does not *compel* that interpretation in such cases.[13]

Broadly interpreting section 3 of the CARES Act to establish a default rule that references to "this Act" mean an entire division would risk adopting a rigid, unworkable definition of "this Act"—one that Congress presumably would not have intended to create. In our view, the better interpretation of section 3 is that the section requires that, unless expressly provided otherwise, references to "this Act" be treated as referring to no more than, but not necessarily all of, the pertinent division. Accordingly, while section 3 makes clear that the references to "this Act" in section 4018 do not include provisions outside Division A of the CARES Act, section 3 does not answer whether "this Act" in section 4018 refers to all of the provisions of Division A or to a smaller subset of provisions, such as CESA.

## II.

For the following reasons, we conclude that "this Act" in section 4018 refers to CESA (the Coronavirus Economic Stabilization *Act* of 2020) itself and not to the entirety of Division A of the CARES Act. Section 4018 therefore does not authorize the SIGPR to conduct oversight of programs established outside of CESA.[14]

---

[13] The SIGPR argues that the narrower interpretation of section 3 would replace the "expressly provided otherwise" standard with a "context indicates" standard. SIGPR Supp. Mem. at 5. The narrower interpretation we adopt, however, would continue to apply the "expressly provided otherwise" criterion, but to a different default rule—namely, that "this Act" refers to *no more than* the pertinent division. For example, section 15010 of Division B of the CARES Act, as originally enacted, authorized the Pandemic Response Accountability Committee to conduct and support oversight of "covered funds," which the section defined to include funds made available under "this Act." CARES Act § 15010(a)(6), (b). Even under the narrower interpretation of section 3, the reference to 'this Act' in the definition of "covered funds" would not include Division A unless Congress had expressly provided otherwise—as it subsequently did: Congress amended the section to strike the reference to "this Act" and replace it with "the Coronavirus Aid, Relief, and Economic Security Act (divisions A and B)." CAA 2021, div. O, § 801(b)(1).

[14] Section 4018(c)(1) limits the SIGPR's jurisdiction to programs that involve the "making, purchase, management, and sale of loans, loan guarantees, and other investments" by Treasury or the "management" by Treasury. Because we conclude that the references to "this Act" in section 4018 limit the SIGPR's jurisdiction to oversight of

## A.

Section 4018 authorizes the SIGPR to conduct oversight of "the making, purchase, management, and sale of loans, loan guarantees, and other investments made by the Secretary of the Treasury under any program established by the Secretary under *this Act*, and the management by the Secretary of any program established under *this Act*," CARES Act § 4018(c)(1) (emphases added), but the text of the section does not specify whether "this Act" refers to Division A of the CARES Act or to a smaller subset of provisions. The statutory structure and legislative history of section 4018 show, however, that section 4018's references to "this Act" mean, quite simply, the "Act" that section 4018 is within: CESA.

Most importantly, CESA itself, in which section 4018 appears, is specifically denominated as a distinct "Act." Section 4001 states that "[t]his subtitle may be cited as the 'Coronavirus Economic Stabilization Act of 2020.'" This short title suggests that CESA "should be considered a separate act for the purpose of construing the provisions within [CESA]," and it "follows from the fact that [CESA] was intended to be understood as a separate 'Act' . . . that the term 'this Act' in [CESA] refers only to [CESA]." *Effect of Appropriations Rider*, 14 Op. O.L.C. at 15; *see also United States v. Batchelder*, 442 U.S. 114, 118 (1979) ("As we read the [omnibus] Act, each substantive statute, in conjunction with its own sentencing provision, operates independently of the other."). Ensuring that CESA is "considered a separate act for the purpose of construing the provisions within [CESA]" in fact "appears to be the only purpose for Congress's separate designation of [CESA] as [an] Act[]." *Effect of Appropriations Rider*, 14 Op. O.L.C. at 15.

The SIGPR contends that statutory titles and headings "cannot undo or limit that which the text makes plain." SIGPR Supp. Memo at 17 (citing *Bhd. of R.R. Trainmen v. Balt. & Ohio R.R. Co.*, 331 U.S. 519, 529 (1947)). But it is "well-recognized that the title of a statute" is "essentially a part of the act and is itself a legislative expression of the general scope of the bill." *Use of Federal Employees for Olympic Security*, 20 Op. O.L.C. 200, 203 n.5 (1996) (quotation marks omitted). Titles therefore have "a communicative function" that can affect the meaning or scope of

---

programs established under CESA, we do not need to consider whether the SIGPR's oversight of the programs at issue would be consistent with these additional limitations.

a statute. *Brady Act Implementation Issues*, 20 Op. O.L.C. 57, 61 (1996) (quotation marks omitted); *see, e.g.*, *INS v. Nat'l Ctr. for Immigrants' Rights*, 502 U.S. 183, 189 (1991) ("The text's generic reference to 'employment' should be read as a reference to the 'unauthorized employment' identified in the paragraph's title." (emphasis omitted)). And, apart from whatever meaning Congress conveyed through the specific words in the title, the use of a separate title, in itself, designated CESA as a separate enactment, thus suggesting that Congress intended CESA to "operate[] independently" of the rest of the CARES Act, of which CESA merely one small but important part. *Batchelder*, 442 U.S. at 118. Because section 4018 is within CESA, the section's references to "this Act" therefore are most naturally understood to refer to CESA.

Moreover, section 4018 authorizes the SIGPR to conduct oversight regarding "loans, loan guarantees, and other investments" made by Treasury. CARES Act § 4018(c)(1). It further specifies that the SIGPR shall collect and summarize five different categories of information, each of which refers to "loans, loan guarantees, and other investments." *Id.* § 4018(c)(1)(A)–(E). And it specifies that "[t]he nomination of an individual as Special Inspector General shall be made as soon as practicable after any loan, loan guarantee, or other investment is made under section 4003" of CESA. *Id.* § 4018(b)(2). These repeated references to "loans, loan guarantees, and other investments" in section 4018 dovetail with the primary purpose of CESA, which was to provide "loans, loan guarantees, and other investments" to eligible businesses and entities. *Id.* § 4003(a). The phrase "loans, loan guarantees, and other investments" appears frequently throughout CESA,[15] but does not appear even once in Division A

---

[15] *See also, e.g.*, CARES Act § 4020(b)(2) (requiring report on "[t]he impact of loans, loan guarantees, and investments made under this subtitle"); *id.* § 4026(f)(1) ("The Comptroller General of the United States shall conduct a study on the loans, loan guarantees, and other investments provided under section 4003."); *id.* § 4027(c)(1)(A) (limiting direct appropriation to being used for, among other things, "modifications, restructurings, or other amendments of loans, loan guarantees, or other investments in accordance with section 4029(b)(1)" after January 1, 2021); *id.* § 4028 ("Nothing in this subtitle shall be construed to allow the Secretary to provide relief to eligible businesses, States, and municipalities except in the form of loans, loan guarantees, and other investments as provided in this subtitle and under terms and conditions that are in the interest of the Federal Government."); *id.* § 4029(b)(1) ("Except as provided in paragraph (2), any loan, loan guarantee, or other investment outstanding on the date described in subsection (a)– (A) may be modified, restructured, or otherwise amended; and (B) may not be forgiven.").

outside of CESA.[16] CESA's direct appropriation to carry out CESA also funds the Office of the SIGPR itself. *See* CARES Act § 4027(a); *id.* § 4018(g). These features of the statute further suggest that Congress created the SIGPR specifically to oversee the programs established under CESA.

In short, the CARES Act explicitly designates CESA as a distinct "Act"; CESA establishes the SIGPR; CESA's description of the SIGPR's oversight duties mirrors language used throughout CESA but not elsewhere in Division A; and CESA's direct appropriation to carry out CESA funds the SIGPR. This concatenation of facts would be very odd if Congress had intended the SIGPR to oversee programs outside of CESA.

Our conclusion is also supported by the drafting history of section 4018. *See Whether Reservists Must Exhaust Available Leave Under 5 U.S.C. § 6323(b) Before Taking Leave Under 5 U.S.C. § 6323(a)*, 36 Op. O.L.C. 129, 141 (2012) (concluding that "[t]his interpretation of the statutory language is confirmed by the drafting history of section 6323(b)" based upon the reasons specific language was added to the section during the legislative process). CESA originally was drafted by a Republican task force focused on providing relief to the airline industry and other large corporations.[17] The task force's proposal was then incorporated into a version of the CARES Act introduced by Senate Republicans. *See* S. 3548, 116th Cong., div. C, tit. I (2020). As originally drafted, CESA would have authorized Treasury "to make or guarantee loans to

---

[16] Section 11001 of title I of Division B also deals with loans and contains language similar to CESA: It states that "[o]f the funds made available to the Rural Development mission area in this title, and in addition to funds otherwise made available for such purpose, not more than 3 percent may be used for administrative costs to carry out *loan, loan guarantee and grant activities* funded in this title to prevent, prepare for, and respond to coronavirus, domestically or internationally" (emphasis added). Because this reference is within Division B, section 4018 would not authorize oversight of these activities even under the SIGPR's interpretation.

[17] *See* 116 Cong. Rec. S1818 (daily ed. Mar. 19, 2020) (statement of Sen. McConnell); *id.* at S1831 (statement of Sen. Wicker); Press Release, S. Comm. on Appropriations, *Shelby, Thune, Wicker Unveil Liquidity Assistance for Distressed American Industries Within Coronavirus Package* (Mar. 19, 2020), https://www.appropriations.senate.gov/news/shelby-thune-wicker-unveil-liquidity-assistance-for-distressed-american-industries-within-coronavirus-package. Once the Senate arrived at a bipartisan agreement, the Senate passed the CARES Act as an amendment to H.R. 748. *See* S. Amend. No. 1578, 116th Cong. (2020).

eligible businesses" of up to $208 billion. *Id.* § 3102. The proposed act contained just eight provisions, none of which provided for any oversight of the $208 billion fund. *See id.* §§ 3101–3108. And, although one provision did require limits on the compensation of certain employees of eligible businesses, the proposed act generally did not restrict how eligible businesses could use the funds. *See id.* § 3103.

Democrats were then added to the task force for the purpose of negotiating and reaching a bipartisan agreement.[18] At some point during these negotiations, Republicans and Democrats agreed that CESA would authorize Treasury "to make loans, loan guarantees, and other investments in support of eligible businesses, States, and municipalities" of up to $500 billion. CARES Act § 4003. Democrats, however, expressed serious concern with the lack of oversight of the $500 billion fund and the lack of restrictions on how eligible businesses could use the funds.[19]

---

[18] *See* 166 Cong. Rec. S1909 (daily ed. Mar. 22, 2020) (statement of Sen. Thune); 166 Cong. Rec. S1976 (daily ed. Mar. 24, 2020) (statement of Sen. McConnell); *id.* at S1924 (statement of Sen. Thune).

[19] *See, e.g.* 166 Cong. Rec. S1910 (daily ed. Mar. 22, 2020) (statement of Sen. Menendez) ("This bill has a $425 billion slush fund with which, basically, the Secretary of the Treasury can say: I like you; you get this. . . . There is no transparency. . . . We have to know, when we are making these investments, that they protect workers and that we are not going to have all this money, in part, be used for stock buybacks."); *id.* at S1914 (statement of Sen. Schumer) ("What it has is, for instance, a giant, giant corporate bailout fund with no accountability."); 166 Cong. Rec. S1921 (daily ed. Mar. 23, 2020) (statement of Sen. Schumer) ("The bill still includes something that most Americans don't want to see: large corporate bailouts with almost no strings attached. . . . We are looking for oversight. If this Federal Government is making a big loan to someone—to a big company, we ought to know it and know the details immediately."); *id.* at S1936 (statement of Sen. Manchin) ("We are worried about a $500 billion payout with very little oversight and transparency."); *id.* at S1941 (statement of Sen. Van Hollen) ("[T]here are some areas where we need to reach final agreement. One of them is proper oversight and safeguards on the $500 billion fund to help some of the biggest businesses in the country."); 166 Cong. Rec. S1984 (daily ed. Mar. 24, 2020) (statement of Sen. Schumer) ("We cannot have the situation where, when a company is getting money from the Treasury, the Federal Reserve, we don't know about it. . . . [W]e are fighting for oversight, a new inspector general, to be able to look into these contracts."); 166 Cong. Rec. S2044 (daily ed. Mar. 25, 2020) (statement of Sen. Coons) ("There is a $500 billion fund . . . that, as initially written and proposed, would help sustain some of our iconic industries like the airlines, but with almost no transparency, in terms of the loans or the grants that would be given, and almost no restrictions on how the companies to receive them might use them, for what purposes.").

Several provisions were added to CESA to address these concerns.[20] Instead of only the eight original sections, the CESA that Congress enacted contained twenty-nine sections, many of which, such as section 4018, required oversight of the loan program or established restrictions on the use of the funds. *See, e.g.*, CARES Act § 4003(c) (requiring certain restrictions on stock repurchases and dividends); *id.* § 4018 (establishing the SIGPR); *id.* § 4019 (prohibiting loans to certain entities with conflicts of interest); *id.* § 4020 (establishing the Congressional Oversight Commission); *id.* § 4026 (requiring Treasury to report loans to Congress). This history confirms that Congress created the SIGPR specifically to oversee

---

[20] *See, e.g.*, 166 Cong. Rec. S2044 (daily ed. Mar. 25, 2020) (statement of Sen. Coons) ("There is a $500 billion fund—the subject of much discussion and debate . . . . One of the things I am most proud of is that there will be now an accountability board, a pandemic response accountability committee—both an inspector general, a special inspector general, and $80 million in this bill for the operation of that accountability committee."); *id.* at S2026 (statement of Sen. Schumer) ("Democrats also secured tough new requirements on Federal grants and loans to any industry: no stock buybacks for the length of any loan provided by the Treasury, plus 1 additional year; restrictions on any increases to executive compensation; a requirement to protect collective bargaining agreements . . . . We compelled the creation of Treasury Department Special Inspector General to provide oversight of Treasury loans and investments, an accountability committee to protect taxpayer dollars, and a congressional oversight Commission as well."); 166 Cong. Rec. H1851 (daily ed. Mar. 27, 2020) (statement of Rep. Waters) ("Moreover, the bill creates a Special Inspector General for Pandemic Recovery to combat waste, fraud and abuse and scrutinize every dollar spent in the administration of this $500 billion Treasury program."); *id.* at H1853 (statement of Rep. Maloney) ("The bill requires the Special Inspector General to track all loans, loan guarantees, and other obligations and expenditures made by the Treasury Department under the bill."); *id.* at H1859 (statement of Rep. Bonamici) ("[T]his bill includes $500 billion in loans to companies to provide security to our economy. We fought tirelessly to make sure that these loans are subject to strong oversight and robust guardrails to provide accountability and protect the American workforce."); 166 Cong. Rec. E343 (daily ed. Mar. 31, 2020) (statement of Rep. Eshoo) ("What we were able to secure is an Inspector General to oversee the funds to ensure transparency and accountability."); *see also, e.g.,* H. Comm. on Fin. Servs., *Committee Priorities Included in H.R. 748, the CARES Act* at 3 (Mar. 18, 2020) (stating that the SIGPR is being created "to combat waste, fraud and abuse in the administration and use of $500 billion by Treasury to provide loans, loan guarantees or investments for eligible businesses, non-profit organizations, states, territories and municipalities"); H. Comm. on Fin. Servs. Minority, *The CARES Act Supports Distressed Main Street Businesses* at 2 (Mar. 25, 2020) (noting that the CARES Act "[c]reates a new Special Inspector General for Pandemic Recovery with subpoena power to investigate the sale of loans, loan guarantees, and any other investments made by the Treasury").

the programs established under CESA, and particularly CESA's $500 billion fund, rather than Division A more generally.[21]

Finally, the Office of Law Revision Counsel added a note to section 4018 which states that the section's reference to "this Act" "probably means" CESA. 15 U.S.C. § 9053 note. Even though its statements are not legislative acts, *see The Secretary of Transportation's Continued Authority to Sell the Consolidated Rail Corporation Under the Regional Rail Reorganization Act in Light of INS v. Chadha, 462 U.S. 919 (1983)*, 7 Op. O.L.C. 153, 156 n.2 (1983) ("The subsequent decision to classify the statutory provision as a note was made by the Law Revision Counsel . . . and not by Congress itself as a legislative act."), we have previously cited the views of the Office of Law Revision Counsel as useful points of reference, *see e.g.*, Memorandum for Stephen S. Trott, Assistant Attorney General, Criminal Division, from Charles J. Cooper, Assistant Attorney General, Office of Legal Counsel, *Re: Labor Department's Criminal Investigative Authority Under Section 805(b) of the Crime Control Act of 1984* at 7 (Aug. 29, 1986) ("Finally, we note that the Office of the Law Revision Counsel, a part of the legislative branch, has interpreted the term 'this title' in section 805(b) to refer to title I of ERISA."). Here, the assessment of these technical experts reinforces the conclusion to which our own analysis leads us.[22]

---

[21] Some Members of Congress subsequently have asked the SIGPR to investigate "*any*" fraud with respect to CARES Act funds. *See* SIGPR Quarterly Report to Congress at 19 n.61 (Sept. 30, 2020); SIGPR Supp. Memo at 14–15 & nn.57–59. These post-enactment statements by individual Members of Congress, which do not even specifically address the jurisdictional question at issue here, have little, if any, weight in construing section 4018. *See Blanchette v. Conn. Gen. Ins. Corps.*, 419 U.S. 102, 132 (1974) ("[P]ost-passage remarks of legislators, however explicit, cannot serve to change the legislative intent of Congress expressed before the Act's passage.").

[22] TIG offers one further argument for rejecting the SIGPR's interpretation of section 4018: Noting that there is agreement that TIG has jurisdiction over the CARES Act programs at issue, TIG contends that "the designation of one IG in this case acts to exclude the other." TIG Memo at 6. Because we believe that the reasons provided above are sufficient to conclude that section 4018 does not authorize the SIGPR to oversee programs established outside of CESA, we need not decide whether there exists a presumption that the authority of one inspector general may be construed to limit the authority of another.

**B.**

We have considered the arguments for a contrary interpretation, and they do not alter our conclusion.

*First*, the SIGPR points out that CESA contains several references to "this subtitle," i.e. subtitle A of title IV of Division A of the CARES Act, the subtitle that constitutes CESA. *See* SIGPR Memo at 4; SIGPR Supp. Memo at 19–20; *see, e.g.*, CARES Act § 4002 (setting forth definitions of terms "[i]n this subtitle"); *id.* § 4006 ("In implementing this subtitle with respect to air carriers, the Secretary shall coordinate with the Secretary of Transportation."). Indeed, section 4020, which established the Congressional Oversight Commission to oversee CESA, specifies that the Commission should "conduct oversight of the implementation of *this subtitle*" and "review the implementation of *this subtitle*." CARES Act § 4020(b) (emphases added). The SIGPR argues these references "show that when Congress intended to refer to only Title IV, Subtitle A, it appropriately used the phrase 'this subtitle,' not 'this Act,' as TIG would argue." SIGPR Memo at 5.

This argument has some force. "[W]hen we're engaged in the business of interpreting statutes we presume differences in language like this convey differences in meaning." *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1723 (2017); *cf. NLRB v. Sw. Gen., Inc.*, 137 S. Ct. 929, 939 (2017) ("When Congress wanted to refer only to a particular subsection or paragraph, it said so."). This canon of statutory interpretation, however, is not invariably controlling. *See Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 536–37 (2013) ("[W]e normally presume that the words 'lawfully made under this title' carry the same meaning when they appear in different but related sections," but "doing so here produces surprising consequences."). And we are particularly cautious about over-reading small differences in language in the context of the CARES Act, which is a massive statute put together in a few days during an emergency.

We have not located any legislative or drafting history suggesting that Congress intended for the SIGPR to have broader oversight authority than the Congressional Oversight Commission. To the contrary, the drafting history suggests that Congress intended them to have similar jurisdic-

tion.[23] And, as discussed above, the statutory context and drafting history of CESA show that Congress created the SIGPR to oversee the programs established under CESA. That CESA sometimes refers to "this subtitle" instead of "this Act" is not sufficient to overcome those compelling contextual and historical signals.

*Second*, the SIGPR notes that section 4018 provides jurisdiction over "the making, purchase, management, and sale of loans, loan guarantees, and other investments made by the Secretary under any program established by the Secretary under this Act" *and* "the management by the Secretary of any program established under this Act." SIGPR Supp. Memo at 21; *see* CARES Act § 4018(c)(1). The SIGPR argues that the second clause would have "no operative effect under [TIG's] reading since the programs of title IV, subtitle A clearly fall within the first category of SIGPR jurisdiction," and therefore that "[l]imiting SIGPR's jurisdiction to programs in [CESA] effectively crosses out SIGPR's second duty to oversee the Treasury's management of '*any* program'" under the Act. SIGPR Supp. Memo at 21.

If construing "this Act" in section 4018 to refer only to CESA would render meaningless the SIGPR's statutory authorization to oversee "the management by the Secretary of any program established under this Act," that fact would counsel against such a construction. *See Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 632 (2018) ("As this Court has noted time and time again, the Court is obliged to give effect, if possible, to every word Congress used." (quotation marks omitted)). But we do not agree that the construction would have this effect. Read naturally, section 4018's clause concerning "the management by the Secretary" establishes that—in addition to overseeing the day-to-day activities of CESA's loan

---

[23] *See, e.g.*, 166 Cong. Rec. S1984 (daily ed. Mar. 24, 2020) (statement of Sen. Schumer) ("In addition, we are fighting for oversight, a new inspector general, to be able to look into these contracts. We would like very much, and believe we should have, a congressional oversight board as well. We are fighting for transparency, oversight, and disclosure when the Federal Government gives corporations money."); 166 Cong. Rec. S2026 (daily ed. Mar. 25, 2020) ("We compelled the creation of Treasury Department Special Inspector General to provide oversight of Treasury loans and investments, an accountability committee to protect taxpayer dollars, and a congressional oversight Commission as well."); 166 Cong. Rec. H1859 (daily ed. Mar. 27, 2020) (statement of Rep. Bonamici) ("The bill creates a Treasury Department Special Inspector General for Pandemic Recovery, as well as a Congressional Oversight Committee, to make sure that the loan program is fully transparent and accountable to the American people.").

program—the SIGPR is authorized (and directed) to oversee broadly Treasury's administration of the program, including even those administrative functions that do not relate directly to loans, guarantees, and investments. *See Special Inspector General for Pandemic Recovery Initial Report to Congress* at 31 (Aug. 3, 2020) ("The SIGPR Office of Audits has the mission to conduct audits of loans, loan guarantees, and other investments made by Treasury under any program established by Treasury under Division A of the CARES Act and to perform audits of the management by Treasury of programs established under Division A of the CARES Act."). While it would be possible to construe section 4018 to authorize this sort of oversight without such explicit language, the clause functions to provide useful clarity and direction regarding the SIGPR's duties. *Cf. DeNaples v. Office of Comptroller of Currency*, 706 F.3d 481, 487 (D.C. Cir. 2013) ("That there is overlap among the various enforcement provisions is not surprising. . . . Congress could reasonably hand the agencies a palette sufficiently sophisticated to capture the full spectrum of enforcement possibility."). Accordingly, construing "this Act" in section 4018 to refer only to CESA is consistent with the SIGPR's statutory authorization to oversee "the management by the Secretary of any program established under this Act."[24]

*Third*, the SIGPR's initial and first quarterly reports to Congress "offered its best, objective understanding of the jurisdictional contours of the CARES Act and invited Congress to clarify areas in which potential ambiguities remained," and Congress has not taken any action to clarify

---

[24] Under the SIGPR's interpretation, a similar overlap would still exist: Even if section 4018 did not explicitly authorize the SIGPR to oversee "the making, purchase, management, and sale of loans, loan guarantees, and other investments made by the Secretary under any program established under this Act," it would be possible to construe the clause concerning "the management by the Secretary" to include oversight of these activities. This weighs against relying on the canon against surplusage to adopt an interpretation of section 4018 that is at odds with the statute's structure and drafting history. *Cf. Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 699 (D.C. Cir. 2014) ("The canon is particularly unhelpful when both interpretive outcomes lead to some sort of surplusage."); *see also* Memorandum for Judith R. Starr, General Counsel, Pension Benefit Guaranty Corporation, from Troy A. McKenzie, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Whether the Pension Benefit Guaranty Corporation May Enter Into and Incrementally Fund Multiyear Leases Exceeding Five Years* at 13 (Sept. 30, 2015) ("[C]ourts have recognized that it is particularly easy to overcome the surplusage canon when interpreting statutory grants of authority to agencies.").

the SIGPR's understanding in the eight months since its initial report. SIGPR Memo at 2. But "[i]t is impossible to assert with any degree of assurance that congressional failure to act represents affirmative congressional approval of [SIGPR]'s statutory interpretation." *Alexander v. Sandoval*, 532 U.S. 275, 292 (2001) (quotation marks omitted). We therefore do not believe that this post-enactment congressional inaction after the SIGPR's reports has significant bearing on the meaning of "this Act" in section 4018.

*Finally*, the SIGPR contends that "Treasury has twice rejected the approach TIG offers for interpreting the phrase 'this Act.'" SIGPR Memo at 6. In support of this statement, the SIGPR first cites Treasury guidance that includes a discussion of the definition of an "eligible business" for purposes of CESA, SIGPR Memo at 7 (citing *Q&A: Loans to Air Carriers and Eligible Businesses and National Security Businesses* (Apr. 10, 2020) ("Treasury Guidance")), which in section 4002 limits the definition of "eligible business[es]" to those that have not "received adequate economic relief in the form of loans or loan guarantees provided under this Act," CARES Act § 4002(4)(B). Treasury's guidance briefly states that "eligible businesses" should not have "received adequate economic relief in the form of loans or loan guarantees *provided under the CARES Act*." Treasury Guidance at 1 (emphasis added). It is apparent, however, that Treasury did not intend this guidance to offer an authoritative interpretation of the reference to "this Act" within section 4002, much less the references within section 4018. Indeed, if Treasury had intended the guidance to address this issue, the guidance likely would have said either "provided under Division A of the CARES Act" or "provided under CESA," because no one contends that references to "this Act" within CESA refer to the entire CARES Act.

The SIGPR also cites a letter of from Treasury's General Counsel that addresses the application of reporting requirements established by section 15011 of title V of Division B of the CARES Act to payments from the Coronavirus Relief Fund, which is established under title V of Division A. *See* SIGPR Memo at 6 (citing Letter for the Office of the Inspector General, Department of the Treasury, from the Office of General Counsel, Department of the Treasury, *Re: Coronavirus Relief Fund Recipient Reporting* (May 7, 2020) ("Treasury Letter")). The reporting requirements established by section 15011 apply to the expenditure of "covered funds," which title V of Division B originally defined to include "any funds,

including loans, that are made available in any form to any non-Federal entity, not including an individual, under . . . this Act," CARES Act § 15010; *see supra* note 13 (describing subsequent amendment). Citing section 3, the letter from Treasury's General Counsel explained that "the reference to 'this Act' in the definition of covered funds in Division B can only be construed to refer to funds made available under provisions within that division, and thus would not extend to payments from the Coronavirus Relief Fund established under Title V of Division A." Treasury Letter at 4. This letter is consistent with our conclusion that section 3 merely establishes a rule that "this Act" refers to *no more than* the particular division of the CARES Act in which the reference appears—so that a use of the term in Division B does not apply to provisions in Division A—but that "this Act" does not necessarily refer to the entire division.

### III.

We conclude that the term "this Act" in section 4018 of the CARES Act refers only to CESA, and therefore that the SIGPR's jurisdiction is limited to oversight of programs established under CESA.

DANIEL L. KOFFSKY
*Deputy Assistant Attorney General*
*Office of Legal Counsel*
